# Richmond

## BERNARD P. KNOWLES, ADM'R v. SOUTHERN RAILWAY COMPANY.

January 13, 1941.

Record No. 2255.

Present, Holt, Gregory, Browning, Eggleston and Spratley, JJ.

*Sam C. Stowers* and *Frank W. Stowers,* for the plaintiff in error.

*Thomas B. Gay, Wirt P. Marks, Jr., Samuel H. Williams* and *Henry M. Sackett, Jr.,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

Bernard P. Knowles, administrator of J. W. Knowles, deceased, instituted an action for damages against the Southern Railway Company. J. W. Knowles was killed as a result of a fall from a bridge while listing the numbers of cars. At the conclusion of the introduction of the evidence counsel for the railway company moved to strike the evidence. The court after careful consideration sustained the motion, on the ground that J. W. Knowles met his death as the result of a risk which he had assumed in connection with his employment. A verdict and judgment followed in favor of the defendant railway company.

J. W. Knowles was employed as agent and telegrapher at Hurt, Virginia. He obtained this position in the regular and ordinary manner in compliance with the agreement between the Southern Railway Company and the Order of Railroad Telegraphers. He began work at Hurt in September, 1937, and continued until January 23, 1938, the date of his death.

In the town of Altavista the tracks of the Southern Railway Company cross those of the Virginian Railway Company. The Southern maintains an interchange track which is one and one-half miles long and connects the two lines. Cars reaching Altavista on the Virginian are transferred to the Southern on the interchange track and placed in the Southern trains to be delivered at their destination points. The interchange track crosses the Staunton River at a point near the junction with the tracks of the Virginian. Approaching the river from the junction there is a trestle five hundred and eighty feet long. This joins an iron bridge which extends four hundred and ten feet across the river to the west side,

and on that side the iron bridge joins another trestle. The interchange track runs across the river on the bridge and trestles. The bridge is forty-four feet above the water and at the point immediately above the place where the body of Mr. Knowles was found is thirty-one feet from the ground.

The bridge and trestles have a single track. The trestle which joins the bridge on the side next to the Virginian has a walkway on that side, but when the bridge is reached there is no walkway or other means of crossing the river when cars are on the bridge, except by going over the tops of the cars or around their sides. The latter method is very hazardous because the cars utilize the width of the bridge, leaving little or no passageway. When cars are on the bridge there is ample room for a man to go over the tops of the cars without coming in contact with the overhead structure.

One of Mr. Knowles' duties was that of getting a list of the numbers of cars placed on the interchange track by the Virginian and checking this list against the numbers of the cars actually delivered to the Southern. He was required to make a list of such cars showing their location in the train and their destination.

It was customary for the agent of the Virginian to telephone the agent of the Southern at Hurt that loaded cars would arrive to be placed on the interchange track. The agent at Hurt would then go to Altavista, a distance of more than a mile, and verify the numbers of the cars. The trainmen of the Virginian would set the cars off their train and on the interchange track where they could be connected to and pulled away by the Southern train. These cars would, at times, extend upon and beyond the bridge. If the cars had been placed on the interchange track before the agent at Hurt arrived to check them, he was required to check them along the track, and if they extended out on the bridge he was required to go upon the cars on the bridge and check them. Cars on the

trestle could be checked from the four-foot walkway on the side thereof, but cars on the bridge could only be checked by passing over the tops of the cars and reading the numbers on their ends, for, as has been observed above, there was not sufficient room between the sides of the cars and the outer edge of the bridge for a person to pass with the proper degree of safety.

Mr. Knowles was fifty-six years of age, physically and mentally active, and in good health. On January 22, 1938, at 2 P. M. he was notified by telephone by the agent of the Virginian that a Virginian train was approaching with nineteen cars of coal to be transferred to the Southern. He replied to the agent of the Virginian that he would go over as soon as he could.

At approximately 3 P. M. of that day Roy Farmer and Basil Dalton crossed the Staunton River on the bridge in question. They were walking from the south approach going in the direction of the Virginian. The trainmen of the Virginian had placed the cars from the Virginian train on the interchange track and they extended along the trestle and out on the bridge. Two and a half cars were on the bridge. Dalton passed over the tops of the cars while Farmer climbed around the sides. Farmer discovered the unconscious form of Mr. Knowles lying on the ground under the bridge near its north abutment. He died the next day in a Lynchburg hospital. The only statement he made was that he fell. He had some waybills in his hand at the time he was found.

The cars were not attached to any locomotive and were not in motion when Mr. Knowles met his death. The record does not disclose any other employee of the Southern or other person who might have had any part in the accident to Mr. Knowles. The record fails to disclose why he fell and received his mortal injury. It fails to show whether he was going over the tops or around the sides of the cars. Any explanation of the cause of his

fall, or how or why he fell, is purely speculative and conjectural.

Mr. Knowles had worked on the Danville division of the Southern (as an extra agent most of the time) since 1921. He had previously worked as an extra agent at Hurt and was familiar with the "whole layout" there.

The cars which Mr. Knowles was listing on the day he met his death were in interstate traffic. The Southern Railway is an interstate carrier. Damages sought were in the sum of $25,000, which amount exceeds the amount allowed by the Virginia statute for the death of a person caused by the wrongful act of another. (Code, §5787.) This action must, therefore, be controlled by the Federal Employers' Liability Act, 45 U. S. C. A. §51 et seq.

The facts are not in dispute. There is no material fact contradicted. The errors assigned are directed to the action of the court in striking the evidence. The contention vigorously made in this court and also in the court below is that there was sufficient evidence to present a jury question. As indicated, the lower court concluded otherwise and held that Mr. Knowles assumed the risk connected with his duty of car-checking as a matter of law, which barred any recovery for his estate.

The pertinent sections of the Federal Employers' Liability Act are 51 and 54 (45 U. S. C. A., §§51 and 54). Section 51 authorizes an action against an interstate carrier such as the one here considered. Section 54 excludes the defense of assumption of risk in cases where the carrier has violated a statute enacted for the safety of employees and such violation has contributed to the injury or death of the employee. In all other cases the assumption of risk is still a defense in actions brought under the federal act.

The determinative question for us to decide is whether the evidence shows as a matter of law that Mr. Knowles assumed the risk when he undertook to secure the car numbers or whether there is a question of fact for a jury.

Due to our ultimate view of the case other questions are unimportant.

Generally, whether or not one has assumed the risk of his employment is a question for a jury, and the burden of proof on the issue is upon the master. It is error for the court to invade the province of the jury and withdraw from it questions of fact which may be found one way or the other upon the conflicting testimony, or as to which, if there is no conflict in the testimony, different reasonable conclusions may be reached. On the other hand questions of law are never for the jury. Where all of the evidence, fairly considered, points to one conclusion only, a law question is presented.

Can we say as a matter of law that Mr. Knowles assumed the risk incident to his work in checking cars on the bridge? An affirmative answer to that question will lead to an affirmance of the judgment.

The evidence discloses that the position of agent and telegrapher which Mr. Knowles held required of him the performance of duties other than those usually performed by a station agent. We have seen that he was required as a part of his work to check cars transferred by the Virginian to the Southern on the latter's interchange track. He had to make a "switch list," and he frequently had to go over the tops of cars on the bridge in order to complete this list. Mr. Knowles performed these duties and never complained of the conditions under which he had to get the numbers. In the normal exercise of his faculties he was bound to have known that it was dangerous to go over loaded coal cars standing on the bridge. He did this often and was bound to have known that this particular work was a part of his duties as agent. He voluntarily assumed the risk incident to this work and his estate is barred of any recovery for his death. All of the evidence points to that conclusion; therefore there was no question to be submitted to a jury.

A great deal has been written on the subject of the assumption of risk as a defense in negligence cases. In

our conclusion to apply it in the present case as an absolute bar to any recovery, we are not unmindful of the trend in modern cases and statutes toward whittling away this defense as well as the defense of contributory negligence in such cases. Illustrative of this trend we find that in applying the Workmen's Compensation laws such defenses are generally not availing to defeat the workman's claim against the employer when he suffers injury or death by reason of accident in the course of his employment. This is generally by statute. Also illustrative of this trend are the federal statutes already referred to which deny to an interstate carrier, under certain circumstances, the defense of assumption of risk, and which provide that such a carrier may set up an employee's contributory negligence not as an absolute bar, but only in diminution of damages. See also, Virginia Code, §§5792 and 5793.

In Virginia our court has said in *Morris & Company* v. *Alvis,* 130 Va. 434, 107 S. E. 664, speaking through Kelly, P., that "The doctrine of assumed risks is generally regarded as a harsh one, and is not to be extended. In doubtful cases, the question of its applicability is to be determined by the jury."

Regardless of the legislative and judicial trends leading away from the application of this doctrine of assumed risk, it remains as a complete defense in such cases as the present one. We have already seen that there is no question in this case of any violation of a statute enacted for the safety of employees of interstate carriers, and the abolition of the defense of assumed risk by 45 U. S. C. A., §54, controlling in such cases, is not applicable here.

In *Chesapeake & Ohio Railway Company* v. *Meadows,* 119 Va. 33, at page 57, 89 S. E. 244, at page 251, the rule is stated thus: "The true rule of law deducible from the authorities is, that the servant assumes all the ordinary, usual and normal risks of the business after the master has used reasonable care for his protection,

and also all such other risks as he knows of, or which were so unquestionably plain and clear that he must have known of their existence and their danger to him.'' (Citing cases.)

In *Southern Railway Company* v. *Wilmouth,* 154 Va. 582, 153 S. E. 874, the above rule is reiterated. There the employee's action was defeated by the application of the doctrine of assumed risk as a matter of law. Wilmouth's duties required him to obtain car numbers and write them in a book. He was working at night on a bridge. There was a walkway along both sides of the bridge. On the east side it extended across the river, but on the west side it ended at a point just above the river. Wilmouth was on the walkway on the west side and fell into the river and was drowned. Mr. Justice Holt, speaking for the court, said: ''The master must still exercise due care in furnishing a reasonably safe place where work is to be done and the servant assumes risks ordinarily incident thereto, and in addition extraordinary risks 'when obvious or fully known or appreciated by him.' '' Many cases construing and applying the Federal Employers' Liability Act are cited and discussed.

The Federal Employers' Liability Act and the decided cases preserve the distinction between the defenses of assumed risk and contributoy negligence. It is said that the former arises out of the contract of employment while the latter arises out of conduct.

In *Northwestern Pacific Railroad Company* v. *Bobo,* 290 U. S. 499, 54 S. Ct. 263, 78 L. Ed. 462, 463, Bobo was a bridge tender on the railroad. His duties were to uncouple the tracks on the bridge, work the signals, and open and close the draw of the bridge. He was required to go to the building on top of the bridge and operate certain machinery there in connection with opening and closing the bridge. He went up by using unguarded steps which were alleged to be unsafe. His body was found in the water and an action was brought to recover

for his death. A verdict and judgment was recovered in favor of his estate. The Supreme Court reversed the judgment and held that there was no causal connection between the alleged defective steps and the death of Bobo. It further held that Bobo assumed the risk and this barred any recovery. The court observed that Bobo had gone up and down the steps many times. He could easily have seen the alleged defects and must have been aware of them. No complaint was ever made by him concerning the stairway. This was enough, so the court held, to show that Bobo assumed the risk.

See also, *Delaware, Lackawanna & Western Railroad Co.* v. *Koske*, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 578.

It is contended that the Southern Railway Company was negligent in not providing a safe place for Mr. Knowles to check the cars, and in placing them on the interchange track so they would extend on the bridge, necessitating his going over the tops to get the numbers. The risk of this alleged negligence, it is argued, was never assumed by him. Thus it is urged that a servant never assumes the risk of the master's negligence. In *Morris & Co.* v. *Alvis, supra,* this contention is satisfactorily answered in this language (130 Va. at page 447, 107 S. E. at page 669): "It is, of course, well understood that contributory negligence and assumed risk are separate and distinct defenses. An employee may be free from negligence in the particular circumstances of an accident, and still barred from recovering damages for injury resulting therefrom, because he has assumed the risk, and this may be true, even though the accident was due to an unsafe place or an unsafe appliance furnished by the master. Indeed, there is never any occasion for the application of the doctrine of assumed risk unless there has been some question of original negligence on the part of the master. If the master has been free from negligence *in toto* and *ab initio,* there is no liability, and the question of assumed risk (and of contributory negligence as well) does not arise."

The appellant has cited and relied upon many cases from both state and federal jurisdictions. We have read and considered them with care, but will not attempt to discuss or distinguish them. The principle applied in them is not unlike that which we apply here. They have, of course, different facts from those considered here.

The plaintiff in error says that checking cars on the bridge was not the ordinary work of a station agent and that a servant assumes only the risks ordinarily arising from his regular work. The evidence discloses that the agent at Hurt for many years had checked cars on the bridge as a part of his regular duties. Numerous cars were placed on the interchange track every day and they frequently extended out upon the bridge. Mr. Knowles and his predecessors often listed cars on the bridge by going over the tops as a regular part of their duties.

In *Norfolk & Western R. Co.* v. *Jackson's Adm'r,* 85 Va. 489, at page 491, 8 S. E. 370, at page 371, it is said: "It is admitted that the general and well established rule is, that he who enters the service of another for the performance of specified duties for compensation, takes upon himself the natural and ordinary risks incident to the performance of such duties. The law presumes that the employee voluntarily assumes these risks when he enters the service, and that his compensation is adjusted accordingly. Hence, 'he cannot, in reason, complain if he suffers from a risk which he has voluntarily assumed, and for the assumption of which he is paid.' [*Chicago, etc.*] *R. R. Co.* v. *Ross,* 112 U. S. 377, 5 S. Ct. 184 [28 L. Ed. 787]."

Whatever danger there may have been in performing this part of the work was known to Mr. Knowles. He encountered the danger each time he went over the cars, and necessarily must have known of it. He was also bound to have appreciated the danger, for it was open and obvious to anyone in full possession of his faculties, as Mr. Knowles was shown to be. He assumed the risks.

The judgment is affirmed.                    *Affirmed.*