# Richmond

## Lucy M. Bly, Administratrix v. Southern Railway Company.*

October 9, 1944.

Record No. 2870.

Present, All the Justices.

*For opinion on rehearing, see, *post*, p. 406.—Reporter.

The opinion states the case.

*N. W. Borden, F. S. Tavenner* and *F. S. Tavenner, Jr.,* for the plaintiff in error.

*Thomas B. Gay* and *Elliott Marshall,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

Lucy M. Bly, Administratrix of Douglas C. Bly, deceased, instituted an action at law under the Federal Employers' Liability Act against the Southern Railway Company for the wrongful death of the decedent. After the conclusion of the evidence, upon motion of counsel for the defendant, the court struck out all of the plaintiff's evidence. In spite of this, the jury returned a verdict for $3,000 in favor of the plaintiff, which the court promptly set aside.

There were several allegations of negligence in the notice of motion, but the one which we think is material is the allegation that the railway company failed to maintain a safe place for the decedent to perform his duties.

There is no conflict in the evidence. Douglas C. Bly was thirty-six years old at the time of his death, which occurred on November 17, 1941. He was a part-time employee of the Southern Railway Company. He also owned and operated an Esso filling station in Strasburg, Virginia. He was unmarried. For some time he had worked as a brakeman on a passenger train which carried three passenger cars. The railway company operates a line from Harrisonburg, Virginia, to Alexandria, some 140 miles in length. Bly was called to serve as a flagman on a freight train. This freight train, in going from Harrisonburg to Alexandria, was known

as No. 74. Prior to his death, he had made one or two trips on this train as a flagman. He had previously worked on local freight trains as a front brakeman.

On the day of his death Bly had been assigned to work as the rear flagman on train No. 74, and he alone occupied the caboose, where his duties, under the rules of the company, required him to be. His train consisted of 22 cars, besides the tender, engine and caboose, and at Toms Brook, a station and small town, a switching operation took place whereby one car of stone was taken into the train. The locomotive of the train was stopped just north of Toms Brook station, with the rear end, consisting of two or three cars and the caboose, resting on the south end of the Toms Brook bridge. Bly fell to the ground under the bridge and met his death. The caboose of the train was approximately above the supporting pier where the body of the decedent was found. His signal lamp was found on the bridge, approximately above the point where the body was found, which is something like 70 feet from the south abutment of the bridge.

In stopping trains at Toms Brook, similar to this one, where there are 19 cars or more, if the locomotive is stopped at or near the station, the end of the train or the last two or three cars and the caboose will rest on the bridge, and where switching operations are conducted similar to the one above referred to, a mandatory rule of the company is that the flagman must leave the caboose and go back a sufficient distance to flag other trains that may be approaching from the rear.

The bridge is 505 feet long, and from the exhibit filed, it appears to be 63½ feet at the highest point. Photographs of the bridge and the surroundings were introduced. At the point where the decedent met his death it is about 40 feet high. The bridge at the time was 10 feet wide, from end to end of the cross-ties. There was a deck guardrail of 6x8 or 8x8 on both sides of the bridge extending lengthwise and flush with the ends of the cross-ties, placed there to prevent derailed cars from leaving the bridge or "bunching" the ties. The deck of the bridge was uncovered and the ties were 5

to 5½ inches apart. There was no walkway on either side of the bridge which would have provided a place for trainmen to work when necessary. Freight cars in trains crossing the bridge are approximately from 10 feet 2 inches to 10 feet 6 inches in width. The caboose in which the decedent was riding, from the lower step on the rear on one side to the same step on the other was 10 feet 5 inches, the step extending beyond the width of the bridge for some 2 or 3 inches on each side. When the caboose is stopped on the bridge, a flagman's only means of leaving the cab is to go down the steps. His movement in doing this is described by an expert witness in this language: "He would back down the steps, hold to the handrail on the other side of the steps, and when he gets to the bottom step would put his right hand over on the left hand rail and would swing around to the back of the cab and step on the deck of ties."

The station is some 400 feet from the eastern end of the bridge, and almost immediately at that end there is a switch from which a siding runs to the east paralleling the main line for some 1200 feet, upon which the car loaded with stone was standing and ready to be made a part of the train by the switching operation. There were other cars on the siding.

The body of the decedent was found at the base of one of the steel piers supporting the bridge. His watch, with the crystal broken, and his chain, were found on the stub of a cutoff bush. Pieces of the broken watch crystal were found on the pedestal of the steel pier. A cigarette was also discovered near the body, with discolored or charred tip. Approximately above the body on the bridge was the decedent's signal lamp. He met his death on the night of November 17, 1941, at approximately 8:34 P. M. His watch stopped at 8:34, though one witness testified that the watch stopped at 8:38 P. M. The train arrived at Toms Brook at from 8:30 to 8:35. One witness stated that it arrived at around 8:30. It remained at the station 20 minutes, in shifting and taking on the car of stone. It thus appears that Bly met his death a very short time after the caboose was brought to rest

on the bridge. When the train resumed its journey, no "proceed" signal was given by him, because at that time he had already fallen.

The train proceeded, and Bly's absence was not discovered until the train had reached Strasburg Junction. Later a searching party, composed of the crew, was sent out to find him, and his body was discovered about midnight under the bridge.

At the trial the defendant placed only one witness on the stand and he testified as an expert bridge engineer. He had been employed in that capacity for the Norfolk and Western Railway Company, and was a member of the American Railway Engineers Association. He testified that he had examined the Toms Brook bridge; that it was constructed in accordance with the general custom and usage of railway companies generally throughout the United States, similarly situated, where switching operations might require that the caboose be left on the bridge at night; and that good practice and usage among railroads did not require that walkways or lights be provided for such bridges.

The rule of the defendant company previously referred to, requiring a flagman to protect the rear of his train, is in this language:

"When a train stops under circumstances in which it may be overtaken by another train, the flagman must go back immediately with flagman's signals a sufficient distance to insure full protection (not less than one-half mile, and further on descending grades or when the view is obscured), placing two torpedoes, one rail length apart, on the rail on engineman's side of the track, and when necessary, in addition, to display a lighted fusee. * * * "

And another rule reads thus:

"It is their duty to protect the rear of their trains in accordance with the rules, and they must allow nothing to interfere with the prompt and efficient discharge of this duty. They must obey the signal from the engineman prescribed

by the rules, but must not wait for such signal or for orders from the conductor when their trains need protection."

And another rule is:

"They must not allow any other duties to interfere with the protection of their trains, and must require the flagman to perform his duty in accordance with the rules."

The question presented is whether or not a jury could have found that the defendant railway company should have provided a walkway on the bridge for the flagman to use in connection with getting off the caboose at night and going back to flag advancing trains, and if so, whether or not its failure in this respect was the proximate cause of the death of the deceased.

This case being one under the Federal Employers' Liability Act, it is controlled by the 1939 amendment (53 Stat. 1404, c. 685, 45 U. S. C. 54, and the late decisions of the Supreme Court. See *Tiller* v. *Atlantic Coast Line R. Co.* (1943), 318 U. S. 54, 63 S. Ct. 444, 87 L. Ed. 610, 143 A. L. R. 967, and annotation at page 978; *Lilly* v. *Grand Trunk Western R. Co.* (1943), 317 U. S. 612, 63 S. Ct. 33, 87 L. Ed. 497; *Tennant* v. *Peoria, etc., Union Ry. Co.* (1944), 321 U. S. 29, 64 S. Ct. 409, 88 L. Ed. 322; *Owens* v. *Union Pac. R. Co.* (1943), 319 U. S. 715, 63 S. Ct. 1271, 87 L. Ed. 1683.

Assumption of risk was abolished by the 1939 amendment where injury or death results in whole or in part from the negligence of the carrier, and contributory negligence is not a defense in cases of this kind. It only diminishes the amount of damages (45 U. S. C., sec. 53, ch. 2, page 610). Those defenses were not asserted in this case, and we are not concerned with them.

Before a recovery of damages for injury or death can be sustained against a carrier under the Federal Employers' Liability Act, there must be proof of actionable negligence on its part. There must be proof of the causal connection between the negligence and the injury or death. *Tiller* v. *Atlantic Coast Line R. Co., supra; Beamer* v. *Virginian R. Co.*, 181 Va. 650, at page 657, 26 S. E. (2d) 43.

The court below was of the opinion that the evidence was not sufficient to show causal connection between the death of plaintiff's decedent and the alleged negligence of the defendant in not maintaining a walkway on the bridge, if such failure in this respect constituted negligence.

The plaintiff's theory of the case is that her decedent, while making his first or second trip as flagman, in response to the rules of the company, attempted to alight from the caboose to the bridge, fell and met his death; that if the defendant had maintained a walkway along the side of the bridge he would not have fallen, and that there is a presumption that he was free from negligence on his part and in the performance of his duties at the time.

The defendant's position is that the bridge in question was constructed and maintained in accordance with good engineering practice and usage, which was followed by the railway companies generally in the construction and maintenance of like bridges similarly situated, and that sound engineering and safety practices did not require that the Toms Brook bridge have a sidewalk, or protecting rail, for the safety of trainmen who might be required to alight and board trains while standing on the bridge, when ordered to do so by the rules of the company. The defendant's further position is that, even though it might have been negligent in not maintaining a sidewalk along the bridge for trainmen, its failure in this respect was not shown to have been the proximate cause of the death of the plaintiff's decedent; that no causal relation has been shown, and that the cause of his death, so far as the evidence discloses, remains speculative and conjectural; and, therefore, as a matter of law, there could be no liability.

No one saw the plaintiff's decedent fall to his death. The evidence to sustain the case of the plaintiff, if she has one, consists of circumstances and reasonable inferences which, of course, if sufficient and of the right strength and kind, will sustain a verdict.

The jury could have found from the testimony and the photographs that were introduced that the bridge here,

without a walkway, was obviously a dangerous place for a flagman to attempt to alight upon from a caboose. It could also have found that the manner of alighting from the caboose which was described by the defendant's expert witness, and not contradicted, was obviously dangerous. Of course, a dangerous place alone is not sufficient to amount to negligence, but an unsafe place to work provided by the master for the servant is a violation of one of the non-assignable duties of the master, and amounts to negligence.

When we advert to the evidence, there are these significant circumstances: Train No. 74, upon which the plaintiff's decedent was riding, was stopped just beyond Toms Brook station to take on a car of stone. When it was stopped the caboose rested on the bridge some 70 feet from the east abutment. All trains of 19 or more cars going east, unless they were exceptionally long ones, which stopped at or near the station, would cause the caboose to rest on the bridge. The plaintiff's decedent was directed by the rules of the company to get out of the caboose, go across the bridge to the rear and flag and warn any trains approaching from that direction. The usual manner of alighting from the caboose under such circumstances has already been described. The cross-ties on which he had to alight were uncovered and were spaced from 5 to 5½ inches apart. The bridge was not as wide as the caboose from step to step on each side, so that one could not descend the steps in the usual way and get a footing on the bridge. The body of the deceased was found on the ground approximately under the point on the bridge where the caboose rested. His signal lamp was on the bridge at a point close to where the caboose rested. The plaintiff's decedent met his death in the night time, at from 8:34 to 8:38 P. M., at which time it is ordinarily dark. There is no evidence that the moon was shining. The watch and chain were found nearby the body. The crystal was broken, and pieces of it were on the pedestal of the steel pier. A cigarette was found near the body, and it had a scorched or charred tip. There were no lights on the bridge.

Do the circumstances narrated make a case for the jury or are they legally insufficient to support a verdict? No definite line of demarcation can be drawn between cases of negligence which should go to the jury and those which should not. Making a decision on the question is often troublesome and unsatisfactory. The legal rules controlling are not difficult.

Negligence is generally a jury question, not only where there is a conflict in the evidence with relation to the existence of the facts from which negligence may be inferred, but also where there is room for difference of opinion between reasonable men as to the inferences which might fairly be drawn from conceded facts. Shearman and Redfield on Negligence (Rev. Ed.) Vol. 1, sec. 42. There are cases in which no witness disputes another in any material respect, yet a question of fact arises whenever men of good judgment and honest intention may differ as to the legitimate conclusion. The authors referred to, in the same volume at section 42, say: "When facts proved without dispute require the exercise of reason and judgment, so that one reasonable mind may infer that a controlling fact exists and another that it does not exist, there is a question of fact".

Upon the defendant's motion to strike the plaintiff's evidence, not only the truth of the plaintiff's evidence must be accepted, but every reasonable inference of fact that can be legitimately drawn therefrom also must be accepted. If from the facts, negligence may be reasonably inferred, it is for the jury.

As indicated, the defendant's expert witness testified that general usage and custom of railway companies in the United States in the construction of bridges located near stations did not require walkways for trainmen—that it was consistent with sound engineering and safety practices not to have them. There is no contradiction of this testimony. The defendant contends that this uncontradicted testimony conclusively shows that there was nothing in the method in which the defendant's bridge was constructed that would support a finding of actionable negligence.

There is a conflict of authority on the subject, and many cases support the defendant's contention. A leading case is *Titus* v. *Bradford, etc., R. Co.* (1890), 136 Pa. 618, 20 A. 517, 20 Am. St. Rep. 944, where this was said: "The unbending test of negligence in methods, machinery and appliances is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in employers is the same, and however strongly they may be convinced that there is a better or less dangerous way no jury can be permitted to say that the usual and ordinary way is a negligent way for which liability shall be imposed."

The annotator, 68 A. L. R., at p. 1416, says that the statement of law in the *Titus Case*, while much quoted, has not always been consistently followed.

Mr. Justice Holmes in *Texas, etc., R. Co.* v. *Behymer* (1903), 189 U. S. 468, 23 S. Ct. 622, 47 L. Ed. 905, 13 Am. Neg. Cas. 695, says: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." See 35 Am. Jur., Master and Servant, sec. 124.

Due care, which after all is the standard, is generally that degree of care which a man of ordinary prudence would use under the circumstances. The fact that the bridge in question was constructed and maintained in accordance with the usage and custom of railroads tends to show an absence of negligence, but this alone is not conclusive of the exercise of due care by the railway company, for railroads may be abiding by a custom in maintaining bridges that is in fact wanting in due care. The customary way of maintaining a particular place for a servant to work may be a negligent way. Custom ought not to free obvious carelessness of its negligent character. Certainly a uniform custom of railroads to maintain what might be found an unsafe bridge which is constantly used in switching operations, and upon which

there is no walkway for trainmen, ought not to be conclusive that there was no negligence when an employee falls from the bridge because there is no walkway. This court could not declare as a matter of law from the evidence that this bridge was or was not a safe place for trainmen to work. A jury might say that it was or was not unsafe. Custom and usage cannot convert an unsafe place into a safe one, or a safe place into an unsafe one.

The custom and usage of railroads in constructing bridges without walkways may be an entirely safe practice where trainmen are not ordinarily required to work upon them. A bridge located where its exclusive use is devoted to carrying trains across a river or a ravine, and upon which trainmen are not ordinarily required to alight, might be largely controlled by the custom that walkways are not required. On the other hand, bridges that are constantly used by trainmen in switching cars, and upon which they are required to alight from, or to board trains in the day or night time, are in a different category. The character of the use is important in making the distinction.

In *Reetz* v. *Chicago, etc., R. Co.*, 46 F. (2d) 50, relied upon by the defendant, the court seems to indicate this distinction between bridges in open country such as the one in that case and others not so located. The court says: "There is no evidence that guardrailings or foot paths are used in the construction of railroad bridges in the open country * * ". There the opinion does not disclose a bridge used in switching and requiring constant use by trainmen in carrying out their orders such as is the case here. It might be implied from that case that if the bridge had not been in "open country", but was close to a town or station where it is necessary to use it for switching operations, a walkway would be required.

Regardless of the testimony of the expert to the effect that sound engineering and safety practice does not require a walkway for a bridge similar to the one here, we do know that in at least two cases which have reached this court walkways were provided for railway employees to use while

performing their duties. In *Southern R. Co.* v. *Wilmouth*, 154 Va. 582, 153 S. E. 874, the bridge was used for switching purposes, and there were walkways for employees on both sides of the bridge. However, one did not extend the full length of the bridge. And also in *Knowles* v. *Southern R. Co.*, 177 Va. 88, 12 S. E. (2d) 821, a walkway was maintained on the greater portion of the bridge for the use of employees of the company.

In Virginia we have gone as far as any jurisdiction in applying the unbending test of negligence in negligence cases. See *Crosswhite* v. *Southern R. Co.*, 181 Va. 40, 23 S. E. (2d) 777; *Thacker* v. *Klotz*, 175 Va. 267, 7 S. E. (2d) 883; *Chesapeake, etc., R. Co.* v. *Butler*, 163 Va. 626, 177 S. E. 195, and *Southern R. Co.* v. *Lewis*, 110 Va. 847, 67 S. E. 357. See also, *Brady* v. *Southern R. Co.* (1942), 222 N. C. 367, 23 S. E. (2d) 334, 339, and *Southern R. Co.* v. *Wilmouth*, 154 Va. 582, 590, 153 S. E. 874; *Jeffress* v. *Virginia Ry., etc., Co.*, 127 Va. 694, 104 S. E. 393; *Roberts* v. *Southern R. Co.* (1928), 151 Va. 815, 144 S. E. 863, 145 S. E. 255; *Beamer* v. *Virginian R. Co.*, 181 Va. 650, 26 S. E. (2d) 43; *Southern R. Co.* v. *Chadwick*, 144 Va. 443, 132 S. E. 191.

In no case have we gone so far in Virginia, in upholding and applying the unbending test of negligence, as to hold that it alone is sufficient to transform what might be found by a jury to be a plain lack of due care into the exercise of due care, or to permit the doctrine to transform an obviously unsafe place into a safe one.

Our conclusion is that the jury could have found that the bridge in question was an unsafe place for the plaintiff's decedent to have worked.

The further point for decision is whether the jury could have found that there was causal relation between the negligence of the defendant and the death of the plaintiff's decedent. In the absence of evidence, we must assume that he was free from negligence, and that he was killed while in the performance of his duties. The defendant says there is an entire lack of proof as to how he was killed. It admits that he fell and was killed, but claims there was no

evidence of from what point on the bridge he fell, or what caused him to fall, or what he was doing when he fell. Its counsel suggests that he may have lost his balance and fallen from the rear platform of the caboose, or that he may have safely alighted on the bridge and later lost his balance and fell, or he may have attempted to light a cigarette and lost his balance, or he may have been looking at his watch while walking and missed his footing, or he may have been deprived momentarily of his mental faculties and fell. The defendant claims that all of these suggestions are speculation, and no one can say just what happened or just exactly how the decedent met his death.

In *Tennant* v. *Peoria, etc., Union Ry. Co., supra,* the court used this pertinent language:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. *Washington & G. R. Co.* v. *McDade,* 135 U. S. 554, 571, 572, 34 L. Ed. 235, 241, 242, 10 S. Ct. 1044; *Tiller* v. *Atlantic Coast Line R. Co., supra* (318 U. S. 68, 87 L. Ed. 618, 63 S. Ct. 444, 143 A. L. R. 967); *Bailey* v. *Central Vermont R. Co.,* 319 U. S. 350, 353, 354, 87 L. Ed. 1444, 1447, 1448, 63 S. Ct. 1062. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

In the case at bar the facts have been established by cir-

cumstantial evidence which is not uncertain or indefinite, and they do not rest upon presumption. It is not necessary to base an inference upon an inference in order to deduce negligence from the circumstances. A legitimate inference of want of due care on the part of the defendant can reasonably be drawn by a jury from the established circumstances. It is not necessary that the circumstances establish negligence as the proximate cause with such certainty as to exclude every other possible conclusion. It is not necessary to negative every possibility that the accident occurred in some extraordinary manner which would relieve the defendant. Often this would be impossible. All that is required is that a jury be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible.

In Shearman and Redfield on Negligence (Rev. Ed.), Vol. 1, sec. 54, the authors sum up the principle in this language: "In an action to recover damages for a death negligently caused, direct or positive evidence that the negligence caused the injuries is not necessary. The relevant conditions and circumstances surrounding and relating to the occurrence, unless they interdict as a matter of law an inference or inferences necessary to the verdict, may be submitted to the jury, in the absence of direct proof, in order that the jury may determine the inferences, if any, which they create. "However, as indicated in the preceding section, reasonable inference does not include speculative assumption."

We do not think the doctrine of *res ipsa loquitur* has any application to this case. Here the evidence is such that a jury could find either for the plaintiff or the defendant and its finding would be supported by the evidence. There is no necessity for indulging a presumption of negligence where there is evidence tending to show it. Presumption disappears in the presence of evidence.

We think the case should have been submitted to the jury. The judgment is therefore reversed and a new trial is awarded on all issues.

*Reversed and remanded.*