# Richmond

## DON KEITH V. CLINCHFIELD COAL CORPORATION.

June 22, 1949.

Record No. 3503.

Present, All the Justices.

The opinion states the case.

*A. T. Griffith* and *S. H.* and *Geo. C. Sutherland*, for the plaintiff in error.

*A. G. Lively* and *William A. Stuart*, for the defendant in error.

STAPLES, J., delivered the opinion of the court.

The plaintiff in error, Don Keith, (hereinafter referred to as plaintiff) instituted this action against the Clinchfield Coal Corporation (hereinafter called defendant) on September 14, 1944. It was tried in September, 1947, about three years later.

It appears from the evidence that on September 9, 1943, an X-ray of plaintiff's chest was interpreted by Dr. Broome, the physician in charge at the Virginia State Sanatorium at Catawba, as showing that the plaintiff was suffering from nodular pneumoconiosis. This is a disease generally known as silicosis, which, according to the medical authorities, is caused by the inhalation of silicon dioxide dust. The plain-

tiff alleges that his contraction of the disease was due to the negligence of the defendant and he seeks to recover damages therefor.

According to the testimony of Dr. S. G. Davidson, who is in charge of the X-ray department at the Bluefield Sanatorium at Bluefield, West Virginia, the silicon dust particles, in order to be inhaled into the lungs, "have to be very small and concentration varying we will say from a minimum of three and a half to five million per cubic foot of air. These particles are exceedingly small, so small that you don't see them with the naked eye except in a darkened room where a light comes through and splits them, you might see a dot or two of dust. * * * They have to be absorbed by the endethelial cells or lining of the air sacs and carried into the body before they are capable of producing silicosis."

The defendant's electric locomotives, on one of which the plaintiff was employed as brakeman, were equipped with sand boxes from which sand was applied to the steel rails when needed to provide traction in traveling up or down certain grades in the mines. The evidence is uncontradicted that the wheels of the motor grind some of this sand into such fine particles as to constitute a silicosis hazard for persons who are susceptible to it. It appears from a quotation contained in plaintiff's brief from Bulletin No. 13 of the National Silicosis Conference that a study of the subject showed that only about one in five persons who had been exposed to a serious silicosis hazard developed the disease in some degree, and that only about one per cent of those who had been so exposed had suffered any work disablement.

In the operation of the motor, when the sand was applied for traction purposes, the sand dust was thrown back upon the plaintiff when he was occupying his proper position as brakeman of the motor. This exposure to the sand dust had been going on for the entire time (about seventeen years) that the plaintiff had been employed as brakeman for the defendant company.

The plaintiff relies upon two alleged acts of negligence on the part of the defendant: First, he complains of the

failure of the defendant to warn him of the danger of the silicosis hazard caused by his exposure to the sand dust; and, second, failure of the defendant to use proper care to furnish him a reasonably safe place in which to perform the services required of him by providing reasonable appliances or means to protect him from exposure to sand dust. A jury verdict awarding damages to the plaintiff was set aside by the circuit court as contrary to the law and the evidence, and final judgment for the defendant was entered. We are therefore called upon to consider whether there is sufficient evidence to support the jury's verdict.

The testimony of the plaintiff shows that he had full knowledge of the fact that he was being exposed to the sand dust during the entire seventeen years of his employment by the defendant, but was ignorant of the resulting silicosis hazard.

While not denying that the plaintiff's disease of silicosis was caused by his exposure to the dust particles, the defendant contends that its failure to warn the plaintiff of the danger of such exposure was not due to any negligence on its part. This is true, it is claimed, because the fact that the occasional application of sand to the rails in the operation of coal mines created a silicosis hazard was unknown to the management or employees of defendant's mines before the time it was ascertained that plaintiff had contracted the disease. The defendant also claims that such hazard was likewise unknown to the operators and employees of numerous other mines, and it is therefore not to be charged with negligence in failing to discover its existence.

In support of this position, the defendant introduced as a witness, Clyde Teesh, its production manager who had had fourteen years combined experience as foreman, general foreman, superintendant, and general manager, in various coal mines. His experience covered, in addition to those of defendant, mines operated by the Virginia Iron Coal and Coke Company and the Blue Diamond Coal Company, the Benedict Coal Corporation, and many mines in Harlan County, Kentucky. This witness had also observed the

operation of mines of the Stonega Coal and Coke Company and the Sheridan-Wyoming Coal Company, at Sheridan, Wyoming, and fifteen mines in Bell County, Kentucky, operated by the Kentucky Coal Company and the Ben Coal Corporation.

Another of defendant's witnesses was Stephen Canonico, mine superintendent of the defendant company. He was a graduate mining engineer of Lehigh University, and had a total of approximately fifteen years experience in the coal mining business in the states of Pennsylvania, Kentucky, Alabama and Virginia. In addition to the mines in which he had worked, he had visited and inspected mines in Jenkins and Stone, Kentucky, the mines of the Ritter Lumber Company, at Wyoming, West Virginia, and several other West Virginia mines. He had, a year before his testimony, visited six mines at Cresson, Pennsylvania, and about six months theretofore had inspected mines in the State of Wyoming.

R. S. Adams, another witness, had been an employee of the defendant company in its coal mines since 1911, and had held numerous positions with that company, including general superintendent, general manager, and vice president. This witness had also observed the methods of operation in various Kentucky and West Virginia mines of the United States Steel Corporation and the Consolidated Coal Company.

All of these witnesses testified that in the course of their work and visits to other mines they had never heard any intimation that any employees in coal mines were being exposed to a silicosis hazard, due to the dust arising from the sanding of the electric motors. The witnesses agreed that the first time they heard any discussion of silicosis was in 1944, when the General Assembly of Virginia was considering the inclusion in the Workmen's Compensation Act of silicosis as an occupational disease.

It was further shown by numerous witnesses that safety meetings, which were well attended by the management and employees, were held monthly, and all matters affecting any

known risk or hazard to the health or safety of the employees were discussed, but at none of these meetings was any mention ever made of any danger of employees of coal mines contracting silicosis.

The foregoing testimony was in no way controverted by any of the plaintiff's witnesses. There was no evidence that any case of silicosis, caused by exposure in a coal mine, had ever been diagnosed prior to that of the plaintiff in September, 1943; nor was there any evidence from which the jury would have been justified in finding that the managing officials of the company were negligent in failing to discover the silicosis hazard to which the plaintiff was being exposed. We conclude, therefore, that the defendant cannot be held guilty of negligence in failing to warn the plaintiff because no facts were proven from which the jury could infer that, in the exercise of ordinary care, the defendant itself ought to have known of the danger. Negligence is not to be presumed, but the burden rests upon the plaintiff to prove facts from which it can reasonably be inferred.

With respect to the second act of negligence relied on by the plaintiff, namely, that the defendant failed to use proper care to provide reasonable appliances or means to protect the plaintiff from exposure to the silicosis hazard, the defendant relies upon the rule of "the unbending test of negligence." The defendant takes the position that the appliances used in the operation of its motors and the method of their operation conform to the standards established by the usages and customs of the coal mining business.

The three witnesses, Clyde Teesh, Stephen Canonico, and R. S. Adams, whose familiarity and extended experience in the operation of many coal mines we have already adverted to, also testified upon the subject of the custom and usage with respect to the motors provided by the various other mines and the method of their operation. They all testified that the defendant and all the other leading coal companies in the general area of defendant's mines, as well as in

other States, used electric motors of the same general type, and that the same method of sanding the rails for traction was employed by all.

Clyde Teesh stated in his testimony as to the method of using sand in the mines with reference to haulage—"they are essentially the same, same methods used in all of the mines.

"They are substantially similar in all of the large mines that I visited. * * * In general, all of these mines use about the same type of equipment, same tram locomotives, gathering locomotives, mine cars. They are operated very similar in each of those mines. There is no difference to speak of. * * * I have observed the locomotives in the Clinchfield Coal Corporation's mines and they are the same, pieces of equipment similar to the equipment operating in our neighboring mines and operated very similarly, no difference in the haulage methods * * * no essential difference between those operations in this particular respect we are talking about and the operations of these other companies."

Stephen Canonico testified as follows:

" * * * Basically I have observed no difference in the method of hauling coal from the place to the tipple, no difference whatsoever in any of the bituminous mines I have visited in Kentucky, Virginia, Alabama, Pennsylvania or West Virginia. * * * The use of sand in hauling coal in coal mines where steel rails are used is absolutely necessary and very common practice; as far as I know, there is no way to do it without the use of sand in hauling coal on steel rails.

" * * * That is basically the same on all motors. They have a sanding device on locomotives. * * * The purpose of the sanding device on all the locomotives is to put sand on to the rail. And the manner of doing some of these small duties might be slightly different, but basically the locomotive serves the same purpose and fundamentally is exactly the same in all mines."

The above quoted testimony of Teesh and Canonico was fully corroborated by that of R. S. Adams. He also said:

"All I ever seen used sand. Sand boxes and all were just like ours."

It was further shown that it was not the custom or practice of any of the leading coal companies to use respirators or other devices for protecting employees from breathing the sand dust arising from the wheels. The defendant provided respirators, which were available as a matter of comfort for the employees, but their use by the motor crews was not compulsory as the company knew of no danger to be guarded against by their use. These men very rarely used the respirators as they found that they were cumbersome and interfered with their work.

The primary purpose of furnishing the respirators, according to the evidence, was for use by rock drillers and rock dusters, whose duties required them to work in a constant cloud of limestone dust, whereas the motor crews were exposed to sand dust only on the occasions when traction was needed. When the men are spreading rock dust, their nostrils become clogged up unless they use respirators. The rock dust is spread to dilute the coal dust which accumulates in the mines and thus reduce the danger of explosion. Nor is there any evidence that any respirator is so highly efficient as to filter out the microscopically fine particles of sand which alone cause silicosis.

The record shows that in the early 1930's the Workmen's Compensation Law of West Virginia was amended so as to include silicosis as an occupational disease. The effect of this was to make the employer liable to his employees for compensation on account of disabilities caused by silicosis, regardless of any negligence on his part. Thus, the employer became the virtual insurer against any silicosis disability which might be suffered by his employees, and the West Virginia coal operator had a strong incentive to employ every preventive means available. Yet, the evidence shows that no measures were ever used in operating the West Virginia mines different from those employed in the mines of the defendant.

It is significant that the plaintiff produced the testimony of no witness with experience in coal mining operations who was able to point out any known method of combating the hazard of silicosis, although at the time of the trial it was known to exist due to the fact that the plaintiff had contracted the disease.

That the defendant knew of no such protective devices is indicated by the fact that no different method of sanding the rails or protecting the motor crew from the resultant exposure was being employed by the defendant company at the time of the trial, although an Act of the General Assembly had become effective July 1, 1944, more than three years prior thereto, imposing liability upon it under the Workmen's Compensation Act for death or injury of its employees resulting from the disease of silicosis. By that Act, silicosis was declared to be an occupational disease and placed in the same class as accidental injuries or deaths.

We think that what was said in *Virginia Stage Lines* v. *Newcomb,* 187 Va. 677, 682-683, 47 S. E. (2d) 446, is likewise applicable to the evidence in this case:

" * * * While compliance or noncompliance with the usual and conventional use and custom of a business is generally referred to as an 'unbending test' of negligence, it is not necessarily conclusive. That there are exceptions to the rule is pointed out in the opinion of Mr. Justice Gregory in *Bly* v. *Southern R. Co.,* 183 Va. 162, 31 S. E. (2d) 564, 172 A. L. R. 584. A number of the decisions of this court on the subject are therein referred to. We do not think, however, that the evidence here justifies a departure from the general rule. It rather brings this case within the pattern which, in *Jeffress* v. *Virginia Ry., etc., Co.,* 127 Va. 694, 104 S. E. 393, was said to amount to conclusive evidence that ordinary care had been exercised. At page 726 of 127 Va. the rule and modifications thereof are thus stated:

" 'The general usage of the business in a given situation is admissible as evidence of what is reasonable and proper to be done in that situation, from which, along with the

other (if there be other) pertinent facts and circumstances of the case, the jury are to determine the question of negligence. If there be no conflict of evidence as to the existence of the general usage, and nothing in the evidence tending to show, as to employes, that the usage was not reasonably safe or adequate for its purpose and occasion, and nothing, as to strangers, tending to show that the usage did not afford as high protection as would result from any other known and practical methods of the business, then the usage itself is conclusive evidence of the exercise of ordinary care, and no verdict to the contrary should be upheld.' "

■ It follows that we are of opinion that the record in this case contains no evidence which would support an inference that the defendant was guilty of negligence in failing to provide the plaintiff with a reasonably safe place to work.

It is a matter of common knowledge that the work of a coal miner is a hazardous occupation, but, except in the case of disability or death resulting from diseases classified as occupational by the Workmen's Compensation Act, the defendant is liable only for negligence. In this case, it is clear that the plaintiff has failed to carry the burden of proving any such negligence on the part of the defendant.

The plaintiff also contends that the defendant is liable for injuries which he may have suffered by being permitted to work as a member of the motor crew for about six months after the diagnosis of his illness as silicosis by Dr. Broome on September 9, 1943.

■ The evidence shows that the X-ray plate was taken by Dr. Walter C. Elliott, head of the hospital at Lebanon but also employed generally by the Clinchfield Coal Corporation and its employees' Beneficial Association in connection with a hospital at Dante, Virginia. Dr. Elliott was wholly without experience in the disease of silicosis—had never diagnosed a case. He submitted the X-ray to Dr. Broome for his report. At the same time, he informed Dr. Broome that plaintiff had been working in the mines for twenty years and "had been subjected to a considerable amount of

sand dust. He complains now of shortness of breath when in the dust and on vigorous exercise. I would like to have your advice as to whether or not this man should change jobs." In reply to this inquiry, Dr. Broome wrote to Dr. Elliott as follows: "I believe it is the general opinion that changing occupations after X-ray findings show up and symptoms develop helps matters very little, if any, in men who have been following an occupation for as long as Mr. Keith has been in the mines."

Dr. Elliott did not advise the plaintiff to change his occupation, nor did he advise the plaintiff of the fact that he was suffering from silicosis. Nor, so far as the evidence shows, did he advise the defendant company of the fact that the plaintiff had this disease.

The record contains undisputed medical testimony that an X-ray study of plaintiff's chest made on July 9, 1946, showed that the disease had made no appreciable progress since the X-ray taken in 1943, which was submitted to Dr. Broome. This testimony was also to the effect that silicosis is a disease which develops very slowly, and that the plaintiff had developed it from five to seven years before the 1943 X-ray.

It was also contended by the defendant that, if the plaintiff had a good cause of action, it was barred by the one year statute of limitations since the action was not commenced until more than one year after the plaintiff's disease had been diagnosed by Dr. Broome. The plaintiff contended, however, that the statute did not begin to run until he was compelled to quit work by reason of disability resulting from the disease. The question was ably argued, both orally and in elaborate briefs, by counsel for the respective parties. In the view we have taken of the case, however, that the evidence fails to sustain any finding of negligence on the part of the defendant, it is unnecessary for us to discuss or decide whether the action would otherwise be barred.

The judgment complained of is affirmed.

*Affirmed.*