## Richmond.

## The Chesapeake and Ohio Railway Company v. Annie Nixon, Administratrix of Sam Joe Nixon, Deceased.

### November 13, 1924.

1. RAILROADS—*Injuries On or Near Track—Licensee—Master and Servant—Duty to Keep Reasonable Lookout—Case at Bar.*—The instant case was an action for the death of plaintiff's decedent who was run down and killed by a train of defendant company when he was upon the track going ·over it on a velocipede under the express permission of the defendant company and when he was also engaged in inspecting the track as an employee of the defendant company. It was admitted by the engineman and fireman that at the time of accident they were not keeping any lookout ahead.

   *Held:* That defendant company owed to the decedent the duty of having its engineman and fireman keep, while not prevented from so doing by necessary attention, in the exercise of reasonable care, to their other duties, a reasonable lookout ahead for his being on the track in front of the train which killed him on the velocipede he-- was then using, while traversing, at his usual time in the morning, under the express permission given him to so use the track.

2. RAILROADS—*Injuries On or Near Track—Licensee—Track Repairer—Case at Bar.*—In the instant case, an action for death by wrongful act, it appeared from the evidence that the decedent had the express permission of the defendant to traverse the portion of the track upon which the accident occurred at the time of the accident. He was going to and from the place of business in which he was employed by the defendant, along its tracks, in a vehicle provided by it, and at the usual time. As a track repairer he was not a licensee, but, under the circumstances in which he was using the track, although a track repairer, the defendant company owed him the duty of having its engineman or fireman, on the train which killed him, while not prevented from so doing by necessary attention, in the exercise of reasonable care, to their other duties, keep a reasonable lookout ahead for his being on the track in front of the train while it was going over the portion of the track in question. The duty owing to the plaintiff's intestate was not because he was a licensee in the usual acceptation

of that term, but because the privilege granted him gave him the right to expect, and imposed upon the defendant the duty to exercise, a higher degree of care for his protection than if he were simply in the discharge of his ordinary duties as a track repairer.

3. Railroads—*Injuries On or Near Track—Duty to Keep a Lookout—Trainmen's Attention to their Other Duties—Ignorance—Case at Bar.*—In the instant case, where plaintiff's decedent, a licensee, was killed by a train of defendant company it was admitted that the engineman and fireman were not keeping a lookout, but it was contended for defendant that they were prevented from keeping such a lookout by their other duties. It appeared, however, from the testimony of the engineman and fireman that there was no necessary attention at the time to any other duty which prevented the engineman from keeping a lookout. From their evidence the engineman could have attended to the duty which he was engaged on at the time of the accident at some other time. And according to their testimony the real reason the engineman did not keep the lookout was that he did not consider it his duty to keep such lookout.

   *Held:* That it was the duty of defendant company to have instructed the engineman to keep a reasonable lookout for the decedent and hence the ignorance of the engineman was no defense to the defendant.

4. Railroads—*Injuries On or Near Track—Failure to Keep Lookout—Proximate Cause.*—When a railroad owed decedent the duty of having its engineman keep a reasonable lookout for his presence on the track and it was apparent from the evidence that had such lookout been kept, decedent's perilous position and his obvious unconsciousness thereof, would have been discovered, and the accident, by the exercise of reasonable care, could have been prevented, the failure to keep such lookout was the proximate cause of the death of the de - cedent.

5. Federal Employers' Liability Act—*Interstate Commerce—Section Foreman Inspecting Tracks—Case at Bar.*—In the instant case plaintiff's decedent, a section foreman of defendant, was engaged in inspecting the track of defendant which was used in the transportation of interstate commerce at the time he was killed by a train of defendant.

   *Held:* That plaintiff's decedent was engaged in interstate commerce within the Federal employers' liability act at the time he was killed.

6. Appeal and Error—*Weight of Verdict—Facts Established by Verdict.*—Where a fact necessary to support a verdict is a reasonable inference from the uncontroverted evidence, it must be regarded on appeal as an established fact in the case.

7. Negligence—*Death by Wrongful Act—Proof of Negligence—Absence of Evidence in Regard to the Accident—Case at Bar.*—In an action for death there can be no recovery against the defendant where there

is such an absence of evidence as to the situation at the time the decedent was killed as to leave it a mere matter of speculation and surmise as to whether the death was caused by the negligence of the defendant, or solely by the contributory negligence of the decedent. But in the instant case this rule has no application, for though there were no eye witnesses of the accident, the circumstances, shown by the uncontroverted evidence, put the whole situation shortly preceding and practically almost up to the very instant of the accident before the jury, and that situation presented a case in which the death of the decedent appeared to have been proximately caused by the negligence of the defendant.

Error to a judgment of the Circuit Court of Nelson county, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

In this action there was a verdict and judgment for $12,000.00, recovered as a liability under the Federal employer's liability act (U. S. Comp. St. § §8657-8665) against the plaintiff in error, the Chesapeake and Ohio Railway Company (hereinafter called the defendant company, or company), in favor of Annie Nixon, administratrix of Sam Joe Nixon, deceased (who will be hereinafter referred to as plaintiff and the decedent, respectively), for the death of said decedent, alleged to have been occasioned by the negligence of the defendant company, in that the engineman and fireman (the employees of the latter operating a train which ran down and killed the decedent) failed to keep a reasonable lookout for the decedent just before he was killed, when he was upon the track going over it on a velocipede, under the express permission of the defendant company, and when he was also engaged in the discharge of a duty incumbent upon him as an employee of the defendant company, of inspecting the track (over which the defendant company was, at the time,

engaged in interstate commerce), to see if it was in a proper and safe condition.

The circumstances under which the decedent was killed, as shown by the uncontroverted evidence, were as follows:

The decedent was at the time he was killed, and had been for a number of years, a section foreman, his regular hours of employment on his section of the railroad being from 7 a. m. to 4 p. m. daily.   For about a year next preceding his death he lived with his family in a house by the side of the railroad track, on the north side of and opposite a curve in the track.   The track, as it approached the point opposite this house, from east to west, came through a cut several hundred feet east of the house, on a curve which bent to the left, as it extended westward, until it reached a point 575 feet west of the point opposite the house, thence extended a distance of 1,377 feet in a straight line to a point beyond where the decedent was struck on the track by an extra freight train, consisting of engine, tender and ten gondola coal cars, and was killed, on a clear June day, at 6:35 o'clock in the morning.   From thence the track extended on westward, practically straight, for a distance of nearly a mile.   The section on which the decedent was foreman extended from a point east of his house to Midway, a point about one and one-quarter miles west of his home.   The decedent and his force of men began their regular hours of work each morning at Midway, where the tool house was located, at 7 a. m., and ended such hours of work at the same place each afternoon at 4 o'clock.   It was the daily custom of the decedent, foreman, and his men to meet at the tool house from seven to twenty minutes before 7 o'clock, so as to be ready to set out from the tool house promptly at that hour.   Prior to the begin-

ning of his occupancy of the aforesaid dwelling house, the decedent asked and obtained the express permission of the supervisor of track of the defendant company, his superior officer in charge of section foremen of the defendant company on that part of the system of the latter, to make use of a certain velocipede, after he moved into said house, in going to and from the tool house at Midway. The velocipede was a three-wheeled vehicle, made to run over a railroad track, propelled by foot pedals, with a seat for the person using it, located directly over the right hand rail of the track, geared so that it could travel only at a speed of about nine or ten miles an hour—a slow enough speed for the person operating it to have time to inspect the track closely in going over it for any defects which might exist in it needing repair. And one of the rules of the defendant company, which the evidence tended to show was, among others, faithfully observed by the decedent, imposed the duty upon the decedent, whenever he was going over the track, whether in or out of his regular hours of employment, to inspect the track for the purpose aforesaid.

The decedent was seen by the plaintiff, his wife, to go down to the railroad track opposite his home, there put the velocipede on the track, take his seat, and set out thereon for Midway at 6:30 a. m. of the day he was killed, which the evidence tended to show was about his usual time for setting out for Midway each morning. After he had gone some distance he was seen by her to look back just before the train could be seen by him, and thereafter to go on his way, pedalling the velocipede along the track. Just at this moment she saw the train come around the curve above mentioned, dash by the front of the house and on behind the decedent, who was then seen by the wife with his face continuously

turned forward, not again looking back while he was in her sight; and he was in her sight until the train interposed itself between her and him as he was proceeding on the track. The train must have overtaken him in a few seconds, as we must conclude from the speed of the train and the place where the body was found—such speed being about twenty-five miles an hour, as estimated by the defendant's witnesses, and a greater speed is estimated by witnesses for the plaintiff. The body was found 1,952 feet west of the point opposite the dwelling house and lying on the north and right hand side of the track, about nine feet therefrom, on the side of the railway embankment. The head was crushed at the back; the velocipede was broken and scattered into small fragments, some of which were found at different places along the track; the watch of decedent had stopped at 6:35 o'clock. No signal of any kind was given by the train—after the engineman, if he had been on his seat, and the fireman, had he looked, could have seen decedent and the position he was in in ample time for warning blasts of the whistle to have been given, and the train stopped, if the warning had not been heeded, as it was shown in evidence and uncontroverted that the train could have been brought to a standstill in 500 feet. The train went on, without stopping, until it reached the terminal of the run of its crew, which was at Gladstone, a few miles away. Neither the engineman nor the fireman were looking out at the time, and no one on the train saw the accident, or knew that anyone had been struck until the train reached Gladstone.

There was a conflict in the evidence as to whether any wind was blowing at the time, which prevented the decedent from hearing a road crossing blast of the

whistle, which was given just before the train came opposite the said dwelling, and from hearing the noise of the train itself as it approached him.   There was the testimony of several witnesses for the plaintiff, however, to the effect that there was a very strong wind at the time, blowing directly eastward, which carried the noise of said whistle blowing and of the moving train away from the decedent; so that it was a reasonable inference that he did not hear it until it was upon him and struck him.

The engineman and fireman both testified as witnesses for the defendant company and both admitted that they were not keeping any lookout ahead from the time they would have seen the perilous position of the decedent until after they had gone past the place at which he was killed.

The reason the engineman gave for his keeping no lookout at the time just before the train turned the aforesaid curve and came upon the straight track of 1,377 feet and the further stretch of comparatively straight track west of that—altogether a mile or more of practically straight track—is that he stood up on his seat to examine the lubricator and to adjust it, if it needed adjustment, which occupied him until the train had gone past the place where the decedent's body was afterwards found.   He testified that this was a duty which he had to perform at some time as he neared the end of the train's run, which was Gladstone on this occasion; but that there was no particular need for him to have done this at the particular time he did—that the same result would have been attained had he done it a short while afterwards, after he had reached the home of the decedent and the aforesaid stretch of track, extending therefrom toward Midway; or a short while before he reached the home of the

decedent and the aforesaid stretch of track.   He testi-
fied further that he knew the decedent well; knew that
he was section foreman on that section; knew the
location of his home and that he had to go from his
home to his place of work; but claimed that he did not
know at the time whether the decedent's regular
hours of work began at 7 or 7:30 a. m.; that he did not
know that the decedent used a velocipede in going to and
from his work; that he knew that there was a path
alongside the railway from decedent's home to his
beginning place of work at Midway, and that he ex-
pected the decedent would have been in such path at
the time the train was passing over this locality if he
was then on his way to his work; and further to the
effect that he had no idea that he owed any duty to
keep a lookout for the decedent being on the track
at the time, otherwise he would not have taken the
time he did to attend to the lubricator.

The testimony of the fireman was to the effect that
he saw the engineman when he stood on his seat for
the aforesaid purpose, and that he knew the engineman
was not then keeping a lookout; yet that he, the fire-
man, did not thereupon keep a lookout; and knew that
no one was keeping a lookout while the engineman was
so engaged.   The fireman's testimony on this subject
is, in substance, that he was on his seat, from which he
could have looked out of the side window and seen the
decedent ahead a farther distance away, as they
approached him, than the engineman could have
seen him, owing to the curve of the track being in the
fireman's favor and not away from his line of vision; that
he may have been engaged himself in the performance of
some duty, but he did not undertake to say whether
he was so engaged or not; and the fact made prominent
by his testimony is that he had no idea that he owed

any duty of keeping a lookout for the decedent being on the track at the time; otherwise, as may be reasonably inferred from his testimony, he could have spared the time from his other duties to and would have done so.

There was testimony by the plaintiff to the effect that, as the train dashed by her, as aforesaid, she saw the engineman and fireman on the deck between the engine cab and the tender, laughing and talking; which it is claimed on the part of the defendant company is incredible, because of certain physical facts shown in evidence. In view of the testimony of the engineman and fireman, and of the opinion thereon expressed below, further reference to the testimony on this subject is omitted as upon an immaterial issue of fact.

There was also testimony of the plaintiff to the effect that while she could not see the decedent when he was struck on the track by the train, she did see him as he was thrown from the track; which, likewise, it is claimed in behalf of the defendant company is incredible, because of certain physical facts in evidence. Reference to this evidence in detail is also omitted as immaterial, in view of the consideration that the other evidence on the subject, above mentioned, was ample to warrant the jury in finding that the decedent was killed under the circumstances thereby disclosed as above set out.

There was testimony for the defendant company to the effect that the decedent was accustomed, prior to the accident, to take with him to Midway, when he went there each morning, bran to give his cow (which was in a pasture there adjacent to the tool house), while milking her; and that he was accustomed to milk this cow, sometimes in the morning after getting

to Midway, between his arrival and his going to work for the defendant company at 7 o'clock, and sometimes in the evening after his regular hours of work for the company were over. The plaintiff in her testimony stated positively that the cow was not being milked by anyone during a certain period which covered the time of the accident. It is claimed, however, on the part of the defendant company, for reasons which need not be mentioned, that this testimony of the plaintiff is likewise incredible. But since the cow milking, if it was accustomed to be done by the accused, as stated in the testimony for the defendant company, is relied on merely to support the position that the accused, when killed, was on his way to milk the cow—a business of his own—so that he was not then engaged about his master's business, showing that the relationship of master and servant did not then exist between him and the company; and since the evidence is uncontroverted as above stated, from which the inference is to be drawn that the decedent, while on his way to Midway and when killed, was engaged in inspecting the track, a duty imposed upon him as incident to his employment, so that he was then unquestionably about his master's business, detailed reference to the testimony, pro and con, on the subject of the cow milking is also omitted as immaterial.

*Harrison, Long & Williams*, for the plaintiff in error.

*Duncan Drysdale*, for the defendant in error.

Sims, P., after making the foregoing statement, delivered the following opinion of the court:

The questions presented by the assignments of error will, so far as necessary for the decision of the case, be disposed of in their order as stated below.

The chief question thus presented, in various ways (by the assignments that the trial court erred in overruling the motion to set aside the verdict, and in the giving and refusing of instructions), is the following:

[1] 1. Did the defendant company owe to the decedent the duty of having its engineman and fireman keep, while not prevented from so doing by necessary attention, in the exercise of reasonable care, to their other duties, a reasonable lookout ahead for his being on the track in front of the train which killed him on the velocipede he was then using, while traversing, at his usual time in the morning for so doing, that portion of the track which was between his home and Midway, under the express permission given him by the company to so use such track?

The question must be answered in the affirmative.

[2] It appears from the evidence that the decedent had the express permission of the defendant to so traverse the portion of the track mentioned at such time. He was going to and from the place of business in which he was employed by the defendant, along its tracks, in a vehicle provided by it, and at the usual time. As a track repairer he was not a licensee, but, under the circumstances in which he was using the track, although a track repairer, the defendant company owed him the duty of having its engineman or fireman, on the train which killed him, while not prevented from so doing by necessary attention, in the exercise of reasonable care, to their other duties, keep a reasonable lookout ahead for his being on the track in front of the train while it was going over the portion of the track in question.

Several positions are taken in argument in behalf of the defendant company, to the effect that the duty in question, on the part of the defendant, did not exist in the instant case; but as these positions are all based on the assumption of fact that the deceased was not a licensee, and that the defendant owed him no higher duty than that owing to any other track repairer in the discharge of his ordinary duties, it is unnecessary for us to deal with them, or with the authorities cited to sustain such positions.    The duty owing to the plaintiff's intestate was not because he was a licensee in the usual acceptation of that term, but because the privilege granted him gave him the right to expect, and imposed upon the defendant the duty to exercise, a higher degree of care for his protection than if he were simply in the discharge of his ordinary duties as a track repairer.

The following subsidiary questions are also presented by the assignments of error:

[3, 4] 2. Did the necessary attention, in the exercise of reasonable care, to their other duties prevent the engineman from keeping the reasonable lookout ahead above mentioned?    And was the failure to keep such lookout the proximate cause of the death of the decedent?

The first branch of the question must be answered in the negative, and the second in the affirmative.

Laying aside the consideration of any other evidence on this subject, other than the testimony of the engineman and fireman, we see that it affirmatively appears from that testimony that there was no necessary attention at the time to any other duty which prevented the engineman from keeping a lookout ahead for the decedent being on the track in front of the train.    According to this very evidence, the engineman could have

given the necessary attention to the lubricator, about which he was engaged at the time, equally as well at some other time, which would not have interfered with his keeping the aforesaid lookout. And according to this very testimony, too, the real reason why the engineman did not keep such lookout at the time was that he had not been informed and did not consider that it was his duty to keep any lookout for the decedent. Having given the decedent the express permission aforesaid to use the track as he was doing, it was the duty of the defendant company to have had the engineman instructed that it was his duty to keep the aforesaid reasonable lookout for the decedent. Hence, the ignorance of the engineman on the subject aforesaid furnished no defense to the defendant in the premises. And since it is apparent from the circumstances shown in evidence that had such lookout been kept, the perilous position of the decedent just before he was killed, and his obvious unconsciousness thereof, would have been discovered and the accident, by the exercise of reasonable care on the part of the engineman, could have been prevented, it is also apparent that the failure to keep such lookout was the proximate cause of the death of the decedent.

[5, 6] 3. Was the decedent engaged in interstate commerce at the time he was killed?

The question must be answered in the affirmative.

The positions taken in behalf of the defendant company, and the authorities cited in support thereof, do not controvert the fact that the track was being used by the defendant company in the transportation of interstate commerce; nor the correctness of the conclusion that the decedent was engaged in interstate commerce at the time he was killed, if he was then engaged in discharging a duty incident to his employ-

ment of inspecting the track. That the latter was a fact is a reasonable inference from the uncontroverted evidence, and, hence, in view of the verdict of the jury, must be regarded by us as an established fact in the case. That being so, any discussion of the aforesaid positions, or of the authorities cited in support thereof, would be irrelevant, and therefore will not be entered upon.

[7] 4. Are the cases of *Southern Railway Co.* v. *Hall*, 102 Va. 137, 45 S. E. 867, and *Southern Railway Co.* v. *Adams*, 129 Va. 233, 105 S. E. 566, controlling authority to the effect that there can be no recovery against the defendant company in the instant case, for the reason that there is such an absence of evidence as to the situation at the time the decedent was killed as to leave it a mere matter of speculation and surmise as to whether the death was caused by the negligence of the defendant, or solely by the contributory negligence of the decedent?

The question must be answered in the negative.

It is true that in the instant case, as in the cases in question, there was no eyewitness of the accident itself. But there the similarity between the cases ends. In the instant case the circumstances, shown by the uncontroverted evidence, put before the jury the whole situation shortly preceding and practically almost up to the very instant of the accident; thus furnishing evidence from which the situation at that very instant might be inferred by the jury with all of the certainty that would be required even in a criminal case. And that situation, as so inferred, presents a case, in which, for the reasons above stated, the death of the decedent appears to have been proximately caused by the failure of the defendant company to discharge the duty in-

cumbent on it, as above held, of having its engineman and fireman keep a reasonable lookout ahead for the decedent being on the track.

The case will have to be affirmed.

*Affirmed.*