## Richmond

### WILLIAM JOHN ELLIOTT v. HARRY P. ANDERSON, JR., ADMINISTRATOR, ETC.

April 22, 1968.

Record No. 6677.

Present, Eggleston, C.J., Buchanan, Snead, I'Anson, Gordon and Harrison, JJ.

*Phillip B. Morris* (*Browder, Russell, Little & Morris,* on brief), for plaintiff in error.

*Harry P. Anderson, Jr.* (*Satterfield, Haw, Anderson, Parkerson & Beazley,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

Harry P. Anderson, Jr., Administrator of the estate of Walter Rufus Scott, plaintiff, instituted this action against William John Elliott, defendant, to recover damages for Scott's wrongful death, claiming that Elliott was guilty of negligence in the operation of his automobile which proximately caused the death of his intestate. Plaintiff recovered a verdict and judgment of $20,000, and defendant has appealed.

We need only consider defendant's assignment of error which questions the sufficiency of the evidence to support the verdict in favor of plaintiff.

The accident occurred on January 11, 1965, about 6:45 P. M., in Chesterfield County, on U. S. Highway #1, also known as the Jefferson Davis Highway and the Petersburg Pike. Route 1 is a four-lane road having two 11 foot southbound and two 11 foot northbound lanes, with the division between the north and southbound lanes marked by a double yellow line. The dividing line between the two southbound lanes is a broken single white line. The shoulder of the highway on the west side is 9 feet wide.

Mr. Scott, who was 82 years old at the time, and his wife were en route to Florida on the date of the accident. They had driven from Bridgeton, New Jersey and stopped at the Chimney Corner Motel to spend the night. This motel is located on the west side of the highway, north of the scene of the accident. Some time after registering in the motel, the decedent decided to take a walk. He stopped at the Planters Peanut Store and purchased a bag of unshelled peanuts. This store is located on the west side of the highway, south of the Chimney Corner Motel, at or near the bottom of a hill. Further south, at the top or crest of the hill, and on the east side of the highway, is located the Martha-Kay Motel. It was opposite this motel that the accident occurred.

Decedent's body was found in a ditch which runs along the west shoulder of the road, about 9 feet from the edge of the hard-surfaced highway. Unshelled peanuts were found scattered from a point beginning at the west edge of the pavement across the west shoulder to the ditch. Additional peanuts, and the bag with some peanuts in it, were found just beyond the ditch. No peanuts were found on the hard surface. Virginia State Trooper Terry B. Skeens arrived at the scene a few minutes after the accident occurred. He stated that there were no defects in the highway, no skid or tire marks thereon or on the shoulder and no objects found other than peanuts; that the highway was unlighted, the weather was clear and the road dry and straight; and that Scott was wearing a dark gray coat with black trousers and galoshes. There were no eyewitnesses to the accident other than defendant Elliott.

Defendant lives in Colonial Heights, has an office in Richmond and has been driving the Petersburg Pike for eleven years to and from work. He was driving a 1961 Volkswagen Bus, which has a straight front with no hood, rounded at the corners and estimated to be 6 feet wide and 15 feet long. The motor is located in the back, and the vehicle comes equipped with rear view mirrors attached at the front of each side.

Elliott stated that as he approached the point of the accident, it was dark, and he was driving his vehicle south with his lights on low beam because there was traffic, and he was experiencing glares. He said there is always heavy traffic on the Pike at this time of night and he was meeting cars going north. As he recalled, one car was ahead of him going south, but it was about at the top of the hill. He testified that he was driving in the right or outside south traffic lane. Elliott estimated his speed at 40 or 45 miles an hour and stated repeatedly to the trooper on the night of the accident, and during the course of his testimony, that at no time did his car leave the hard surface of the highway.

His statement to Trooper Skeens immediately after the accident occurred, as related by this officer, was: " 'I was going south on Route 1. Suddenly, this shape was in front of me. It was a black outline on the highway. He must have been coming across the highway. I heard the bang and then the glass break. I turned around in the motel and looked, and at first I did not see anything. Then I looked up and down the road and then I saw something move. And then I checked and found this man in the ditch.' " The trooper said that Mr. Elliott stated to him ". . . that he felt sure that the man [Scott] came across, because he saw the blur in front of him and he felt that he was running across"; and that Elliott " . . . was unable to say for sure whether the man was coming across or northbound, in a straight line."

The trooper further testified that on the night of the accident Elliott stated to him several times that he felt that the blur came from the left (east) side of the highway across to the right (west).

Elliott, called as an adverse witness by plaintiff, reiterated that he was in the outside lane, the one next to the west shoulder; that while he could not "pin it down exactly" he suddenly saw a blur on the highway—that Mr. Scott was just about on the dotted line (the dividing line between the two south lanes); that he could not be exact as to how far Scott was away when he first saw him; that he was very close—15 feet or more when he could see the full figure; that he turned the wheel as quickly as he could and swerved to the left; · and that he thought they were going to miss until he heard an impact on the right side when the right rear view mirror snapped back against the side vent and broke.

When Elliott was on direct examination he again testified that when he first saw Mr. Scott he was moving from left (east) to right (west) in front of him and that he swerved his vehicle to the left in an effort

to miss him. When pressed to give an estimate of how far Scott was from the west shoulder when the car struck him, he said: "Well, basing it on how we were going, it is possible, because I can remember thinking in my mind, I am going to miss. I am going to miss. But the impact took place at that time. Mr. Scott must have been possibly two-thirds across this lane, in front of me. He possibly could have gotten that far."

Elliott further said that he did not apply his brakes for he only had time to turn his wheels to the left after seeing Scott.

Following the accident, and as soon as northbound traffic permitted, he pulled across the highway into the south entrance of the motel and drove back to the front of the motel, parking his car with the lights directed across the highway to the approximate point where he thought he had hit something.

The only other testimony pertinent to our inquiry is that given by the clerk at the Martha-Kay Motel. She testified that on the night the accident occurred, Mr. Elliott came into the motel and identified himself as having been involved in an accident. She did not recall his exact words, but did recall that Elliott " . . . asked us if we would call the police for him; that he had hit something he thought, and looked around, it possibly could have been a dog. But to be sure, he wanted to call the police"; that he came back the second time and "[h]e wanted us to call them back real quickly; that he had hit something and that it was a man; he was in the ditch".

Elliott, testifying with reference to his condition following the accident, said that everything seemed to happen quickly; that he was panicky and confused, and he " . . . did not know what on earth could have possibly taken place or how badly this person was hurt or what, and I was mainly concerned with getting to a phone or getting some help, getting someone down there to find out what had taken place." He did not recall telling the clerk he had hit a dog, saying, "[a]ll I know is, I ran into the motel and said, I hit something, someone. I want to get to the phone".

Plaintiff's theory of the case is that his decedent was not crossing the highway at all but was walking northward on the shoulder at the time he was struck and killed. He argues that defendant, when called as an adverse witness, gave inconsistent versions of the accident, making his testimony anything but clear, reasonable and uncontradicted, and that this, together with the physical facts, makes out a prima facie case of negligence.

Plaintiff, having obtained a jury verdict, approved by the trial court,

is entitled to have the evidence viewed in the light most favorable to him, and he is entitled to every reasonable inference therefrom.

The underlying principles involved here are set forth in *Weddle, Administratrix* v. *Draper*, 204 Va. 319, 322, 323, 130 S. E. 2d 462, 465, 466, where this court said:

"Negligence cannot be presumed from the mere happening of an accident. The burden is on the plaintiff who alleges negligence to produce evidence of preponderating weight from which the jury can find that the defendant was guilty of negligence which was a proximate cause of the accident. The evidence produced must prove more than a probability of negligence and any inferences therefrom must be based on facts, not on presumptions. It is incumbent on the plaintiff who alleges negligence to show why and how the accident happened, and if that is left to conjecture, guess or random judgment, he cannot recover. [Citing authorities.]

"When a defendant is called as an adverse witness the plaintiff is not bound by such of his testimony as is in conflict with evidence introduced by the plaintiff; but the plaintiff is bound by so much of the testimony of the defendant as is clear, reasonable and uncontradicted. [Citing authorities.]

\* \* \* \* \*

"It is true that physical facts are sometimes more convincing than oral testimony (*Early* v. *Mathena, Adm'r*, 203 Va. 330, 335, 124 S. E. 2d 183, 187) but when physical facts are relied upon to overcome oral testimony they must be established by evidence so clearly preponderating that the existence of such facts is unmistakable. [Citing cases]" To the same effect, *Bridgeforth* v. *Gibbs, Adm'r*, 207 Va. 127, 132, 148 S. E. 2d 763.

Absent the statements and testimony of defendant Elliott, who is the only eyewitness to the accident, "the physical facts" in this case can be summarized as follows:

On the night of the accident, Mr. Scott walked in a southerly direction from the Chimney Corner Motel, and in the course of his walk purchased a bag of unshelled peanuts from a store located south of this motel.

Thereafter, Mr. Scott's body was found at a point south of the peanut store in a ditch 9 feet from the west edge of the southbound traffic lane of U. S. Highway #1. He obviously had sustained accidental injuries resulting in his death.

Unshelled peanuts were found on the west shoulder of the highway, scattered between the west edge of the hard surface along the shoulder to the ditch, and beyond.

When officers arrived on the scene, defendant's Volkswagen Bus was parked across the highway from the body in front of the entrance to the Martha-Kay Motel. This vehicle showed some slight damage to its right front and side.

Manifestly this testimony standing alone tells nothing as to the manner in which the accident occurred, or how or why Mr. Scott was killed. Examination of the highway, the shoulder, and the scene generally where the decedent met his death, disclosed no tire marks, scuff marks, debris, broken glass, or objects of any kind (other than peanuts) so often present and indicative of the point of collision in cases reviewed by this court.

A careful examination of the statements made by Elliott to the trooper on the night of the accident, and his testimony in this case, disclose few inconsistencies. At all times following the tragic occurrence, Elliott maintained that his vehicle never left the hard surface of the highway. He described the object in front of his vehicle variously as a blur, a figure, a shape, a black outline, a man. Admittedly, the distance decedent was from Elliott when first seen, and the distance that decedent was from the west edge of the pavement at point of impact, were estimates only.

Plaintiff points to the testimony of the trooper that Elliott was unable to say whether Scott was coming across the highway or was northbound. The angle at which decedent was traveling when seen by Elliott, or at the time of impact, is not vital. Nowhere in the record is there any evidence that decedent was northbound on the west shoulder, or on the extreme west side of the southbound lane. Elliott stated repeatedly that his impression was that Scott was running or moving rapidly across his lane and in front of him from left to right. But whether he was running straight across, or at an angle, or was moving northward in front of Elliott near the broken line between the two southbound lanes, is immaterial. In either event, defendant was confronted with an emergency not of his making, on a heavily traveled highway, at night, when his headlights were properly on low beam, and there is no evidence that he was speeding, or that he failed to maintain a proper lookout or did not have his vehicle under proper control.

Plaintiff refers to the statement allegedly made by defendant to

the clerk in the Martha-Kay Motel that he might possibly have hit a dog. Defendant does not recall the statement but admits that he was confused and panicky. Considering the emotional experience of being involved in a fatal accident, and the enormity of the occurrence, this is understandable. Possibly he was unwilling momentarily to accept the fact that he had been involved in an accident resulting in the death of a person. In any event, we do not have here a hit and run driver, but one who stops immediately after an accident occurs, summons the police, and while awaiting their arrival, covers the body of the victim with his coat.

The statements to the motel clerk reflect the physical and mental condition of Elliott at the time, and immediately following the accident, but have no bearing on how or why the accident occurred. For this we can only look to his statements to Trooper Skeens, his testimony at the trial, and to such meager physical facts as do exist.

As was said by Mr. Justice Spratley in *Vaughn* v. *Huff*, 186 Va. 144, 153, 41 S. E. 2d 482, 487, " . . . [t]he physical facts afford ground for unlimited speculation". Plaintiff speculates that the peanuts scattered on the shoulder, and the presence of the body in the west ditch, indicate that decedent was struck while walking on the shoulder and well off the hard surface. This is a possibility.

Defendant testifies that Mr. Scott was struck while running across the highway immediately in front of him and under circumstances which made it impossible for defendant to avoid the accident. This is possible.

Defendant also contends that decedent was struck a glancing blow at or near the rounded right front of the Volkswagen Bus as it was turning left, and that the force of this blow would have necessarily propelled decedent off the pavement across the shoulder a distance of 9 feet to the ditch, and that the peanuts would have scattered along the shoulder by reason of this fact. This too is an explanation.

From the record in this case, we cannot say with any degree of certainty whether decedent had been walking on the east side of Route 1 and was in the act of crossing over to the west when he was struck; or whether decedent started to cross from the west to the east side of the highway and then changed his mind and started back when the accident occurred; or whether he was walking either north or south on the west shoulder and defendant ran off the highway and struck him.

The accident may have been attributable to one of several causes,

for some of which defendant was responsible, and for some of which he was not responsible. A recovery cannot be had on conjecture, guess or random judgment. There are no physical facts in evidence, or conflicts in defendant's testimony which alone, or taken with the physical facts, are sufficient to make out a prima facie case of negligence.

This case has been exhaustively researched, briefed and argued by able counsel for both parties. It is not necessary that we multiply the citation of authorities or analyze the numerous cases cited by counsel which set forth the principles that control our decision. Many are cited in *Weddle, Administratrix* v. *Draper, supra; Vaughn* v. *Huff, supra;* and *Bridgeforth* v. *Gibbs, supra.*

As was pointed out in *Hooker* v. *Hancock,* 188 Va. 345, 356, 49 S. E. 2d 711, 716, each case presents its own problem. The problem here is that although a jury may disregard evidence which it does not believe, it cannot find a verdict which is not based on evidence. If defendant's testimony is discarded as incredible, or viewed as conflicting and unclear, plaintiff, who has the burden of proof, is left without any evidence as to how, why and where the collision occurred. In *Lindberg* v. *Goode,* 200 Va. 784, 790, 108 S. E. 2d 364, 369, Mr. Justice Buchanan, speaking for this court, said:

"The evidence here calls for the application of the principle thus stated in *Garrison* v. *Burns,* 178 Va. 1, 8, 16 S. E. 2d 306, 308:

'While we are not unmindful of the weight which attaches to the verdict of a jury when the verdict has been approved by the trial court, it is the imperative function of this court to set aside the verdict of a jury, even though approved by the trial court, when the evidence does not warrant the finding of the jury.' "

The judgment appealed from is reversed and final judgment for defendant will be entered.

*Reversed and final judgment.*