## Staunton

### Roy L. Sykes, Administrator of the Estate of Harold J. Isleib, Deceased v. Langley Cabs, Incorporated and J. H. Butler Griffin.

September 4, 1970.

Record No. 7183.

Present, All the Justices.

R. *Arthur Jett, Jr.* (*Jett, Sykes & Berkley*, on brief), for plaintiff in error.

*Phillips M. Dowding* (*Dowding & Thomas,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

Roy L. Sykes, Administrator of the estate of Harold J. Isleib, deceased, seeks to recover damages for the wrongful death of the decedent. He alleges that defendant J. H. Butler Griffin, agent and driver for defendant Langley Cabs, Incorporated, was engaged to transport Isleib from a point in the City of Hampton to Fass Brothers' pier in the said city; and that Griffin negligently drove the cab onto said pier at night under adverse conditions of weather and discharged decedent therefrom at a time and place which proximately resulted in his death by drowning. Defendants deny liability.

At the conclusion of all the testimony in the court below, the trial judge struck the evidence of plaintiff and entered summary judgment for the defendants, to which action we granted plaintiff a writ of error.

Harold J. Isleib, of Portland, Maine, was employed as a seaman on the "Francis L. MacPherson", a fishing vessel known as a scalloper. This vessel tied up at Fass Brothers' pier about 6 P. M. on May 1, 1966. Isleib and another shipmate went ashore and returned to the pier by defendants' cab about 10 P. M.

At the time of the events hereinafter related, the three occupants of the cab were Griffin, the driver, Isleib, on the right side of the rear seat, and Carl A. Farley, on the left side. Griffin drove the cab from the street onto the pier by way of "the bridge". This bridge has the appearance of a plank driveway over which vehicles and pedestrians travel to transact business on the pier. The width of the bridge was estimated by plaintiff's witness Farley to be "11 or 12 feet", by defendant Griffin to be "approximately 15 feet", and by witness John R. Lawson to be 12 feet, with two planks or raised areas on each edge approximately 10 to 12 inches wide.

Apparently the cab was stopped on the bridge about midway between the street and the end of the pier. There were no railings or guardrails on the sides of the bridge at that point. The evidence as to what occurred after it stopped is in sharp conflict.

Farley testified that he requested Griffin to take him down to the dock. His testimony as to what occurred there is as follows:

"Q. Now describe to the jury what the condition of the weather was at that time.

"A. It was raining very hard.

"Q. Now what is the next thing that you remember after that; what happened to the cab?

"A. Well, he went down on that pier and he stopped on that bridge.

"Q. Stopped on the pier?

"A. On the bridge. Harold went to get out on the right-hand side and I was talking with the cab driver—I forget his name now —and the next thing he said, he said, 'You better go get your buddy.'

"Q. Who said that?

"A. Cab driver. He said, 'He just went overboard.'

"Q. Where were you at the time he said this?

"A. I was sitting in the back seat.

"Q. You were in the back seat. What door had Mr. Isleib opened; what door had he opened? Can you hear me all right up there?

"A. He opened the right-hand door.

"Q. Now what did you do then?

"A. Well, I started to get out the right-hand door, but the cab was parked too close to the bridge there.

"Q. What do you mean by 'the bridge'; too close where?

"A. Well, it was too close to the outside of the bridge. There was no railing on the bridge. I opened the door up on the other side and I went around front of the car, and I hollered two or three times and I couldn't get no answer, and I couldn't see. It was very dark. So I dove in, anyway.

"Q. You dove into the water?

"A. Yes."

Farley estimated the space between the right side of the cab and the right side of the bridge to be "a foot, maybe a foot". He said the space between the left side of the cab and the left side of the bridge was "probably almost 4 feet there". He further stated that there were no lights on the dock, and no guardrails on the side of the pier "where Isleib went overboard". He described the condition of the pier as very slippery.

On cross-examination this exchange occurred between counsel and witness Farley:

"Q. You didn't see Mr. Isleib get out of the cab, as I understand; is that correct?

"A. Correct.

"Q. First knowledge you had that anything unusual had occurred was when you say Mr. Griffin said, 'You better go get your buddy. He's overboard'?

"A. That's correct.

"Q. And at that time you were seated on the left side on the back seat?

"A. That's correct.

"Q. All right. And you say you then slid over to the right side?

"A. I did, yes.

"Q. And you undertook to get out of the door on the right side?

"A. That's right.

"Q. Did you say that door was open or closed at that time?

"A. Door was open.

"Q. Was it all the way open or part of the way open?

"A. It was open about as far as it would go.

"Q. As far as it would normally swing open?

"A. Yes.

"Q. And you say you didn't get out on that side?

"A. No, I didn't.

"Q. Why? What was the reason for that?

"A. Because it was too close to the outside of the bridge.

"Q. And you estimate that distance to be about a foot; is that what you remember telling the jury?

"A. I would estimate it to be a foot.

"Q. In any event, was so close to the edge of the pier you didn't feel it was even safe for you to step out there?

"A. That's correct.

"Q. But you saw that as soon as you looked out that door?

"A. He said my buddy went overboard, so I looked overboard. All I had to do was look out the door. I could look down into the water.

"Q. You didn't have any trouble seeing there was only a foot from the edge of the cab to the pier?

"A. I would say a foot.

"Q. And you saw it clearly enough so you didn't get out that side?

"A. Yes, sir.

"Q. You went over to the other side?
"A. Yes, sir."

From the evidence of witness Farley, the jury could have concluded that defendant's cab was stopped on the bridge at a point where it was approximately 11 feet wide, unprotected by guardrails, and with nothing delineating its edge except a plank. The jury also could have concluded that the right side of the cab was a foot from the edge of the bridge, and so close that a person opening the rear door of the cab could see directly down and into the water below.

With reference to the time lapse between the stopping of the cab and the disappearance of Isleib, the jury could have found from the testimony of Farley that this was momentary. We paraphrase the testimony of this witness as to what happened after the cab stopped as follows:

> Harold Isleib went to get out on the right-hand side. . . . I was talking with the cab driver . . . and the next thing the cab driver said, you better go get your buddy . . . he just went overboard.

There is nothing in Farley's evidence that would lead a jury to find that Isleib did anything, or had time to do anything, except open the right door of the cab, and, in alighting therefrom, to plummet into the water below.

However, the testimony of defendant Griffin contradicts that given by Farley. Griffin says that he was instructed by his passengers to take them "over to the dock", and that he drove onto the pier and stopped when they "asked me to let them off there, let them off at this particular place". After he stopped, Griffin said that Farley got out on the left side of the cab and Isleib got out on the right side. He was asked what took place after that and responded:

"A. The man got out on the right side, closed the door, and the other fellow walked on around, and he asked, 'Where is the —'
"Q. Now you say he walked around; where?
"A. In front of the cab, on the right-hand side.
"Q. Walked from the left side, around the front to the right-hand side; is that what you mean?
"A. Yes, sir.

"Q. What took place then?

"A. He missed the other man, so he asked, 'Where is the man?' or he called him by name. Of course, I don't know what his name was. And so I got out of the cab and went on around on the right side and we saw the water bubbling, and so this gentleman dived over."

Griffin further testified that the lights were on inside his cab after he stopped it. He estimated that he stopped in the middle of the bridge and that there was approximately 4 feet from each side of the cab to the edge of the bridge. He did not remember whether there were any lights on the pier that night.

If the version of Griffin is accepted, each passenger had approximately 4 feet between the side of the cab and the edge of the bridge in which to alight therefrom and reach a place of safety. Griffin says that both exited the cab safely and that Isleib closed the right door; that it was Farley who noted that Isleib was missing after Farley had walked around to the front of the cab and to the right side; that it was Farley who asked where was Isleib; and that it was then he (Griffin) got out of the cab and saw the water bubbling.

All of this is in direct opposition to the version given by Farley. If true, it can be argued that Isleib alighted safely from the cab, and thereafter may have stumbled, tripped, fallen or in some inexplicable manner gone overboard from the pier. A jury could reject Farley's evidence and so conclude.

However, if Farley's evidence is believed a jury would be justified in inferring therefrom that Isleib fell into the water immediately after opening the door of the cab and while attempting to exit therefrom. There is no dispute that the bubbles in the water were off the right side of the cab.

■ The principles of law that control our decision have often been stated and are well settled. The trial court granted defendants' motion to strike plaintiff's evidence and entered summary judgment for defendants. We therefore consider the evidence very much as on a demurrer to the evidence. All inferences which a jury might fairly draw from plaintiff's evidence must be drawn in his favor. Where there are several, differing in degree of probability, we adopt those inferences most favorable to plaintiff, unless they be strained, forced or contrary to reason. *Taylor* v. *A & P*, 209 Va. 64, 161 S. E. 2d 692 (1968).

■ Langley Cabs, Incorporated was a common carrier. Isleib was riding in its cab as a passenger for hire. While defendants were not insurers of his safety, they owed to him a very high degree of care and were liable for the slightest negligence that such care could have foreseen and guarded against. *Shamblee* v. *Transit Company*, 204 Va. 591, 132 S. E. 2d 712 (1963). The relationship of carrier and passenger does not terminate until after the passenger has alighted from the conveyance and has had reasonable opportunity to reach a place of safety. *Tri-State Coach Corp.* v. *Stidham*, 191 Va. 790, 62 S. E. 2d 894 (1951).

■ Negligence cannot be presumed from the mere happening of an accident, and it is incumbent on a plaintiff who alleges negligence to show how and why the accident happened and if that is left to conjecture, guess or random judgment, he cannot recover. *Weddle* v. *Draper*, 204 Va. 319, 130 S. E. 2d 462 (1963); *Elliott* v. *Anderson*, 208 Va. 753, 160 S. E. 2d 775 (1968).

Here there was no eyewitness who actually saw Isleib as he opened the door of the taxicab or when he fell into the water. To determine whether or not there was an issue to be resolved by the jury, we have to examine the circumstances and conditions surrounding the accident. The negligence of defendants, if such there was, may be established by circumstantial evidence. In establishing negligence it is not necessary that the plaintiff negate every theory or possibility that the accident occurred in some manner which would relieve the defendants of liability.

In *C. & O. Ry. Co.* v. *Nixon*, 140 Va. 351, 364, 125 S. E. 325, 329 (1924), it was claimed there, as in the case under review, that the death of the decedent should not be left to speculation and surmise. We held:

> "It is true that in the instant case, as in the cases in question, there was no eyewitness of the accident itself. But there the similarity between the cases ends. In the instant case the circumstances, shown by the uncontroverted evidence, put before the jury the whole situation shortly preceding and practically almost up to the very instant of the accident; thus furnishing evidence from which the situation at that very instant might be inferred by the jury with all of the certainty that would be required even in a criminal case."

And in *Bly* v. *Southern Ry. Co.*, 183 Va. 162, 175, 176, 31 S. E. 2d 564, 570 (1944), this court, through Mr. Justice Gregory, said:

"In the case at bar the facts have been established by circumstantial evidence which is not uncertain or indefinite, and they do not rest upon presumption. It is not necessary to base an inference upon an inference in order to deduce negligence from the circumstances. A legitimate inference of want of due care on the part of the defendant can reasonably be drawn by a jury from the established circumstances. It is not necessary that the circumstances establish negligence as the proximate cause with such certainty as to exclude every other possible conclusion. It is not necessary to negative every possibility that the accident occurred in some extraordinary manner which would relieve the defendant. Often this would be impossible. All that is required is that a jury be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible." See also *Collins* v. *Smith, Administratrix*, 198 Va. 778, 96 S. E. 2d 818 (1957); *Northern Virginia Power Co.* v. *Bailey*, 194 Va. 464, 73 S. E. 2d 425 (1952).

■ The facts in the instant case were in conflict and were susceptible to more than one interpretation and more than one inference. Depending upon their interpretation, and the version accepted, the jury could have found defendants guilty of primary negligence in stopping the cab and discharging the passenger Isleib in the manner it was done and at a dangerous place on the pier. They could have found that the decedent was guilty of contributory negligence in alighting from the cab at the time and under the circumstances existing. Or they could have concluded the decedent exited the cab safely, and thereafter, for some unexplained reason, fell from the pier.

Since reasonable men could have differed as to the conclusion to be reached from the evidence, the primary negligence of defendants, the contributory negligence of decedent and the proximate cause of decedent's death became questions of fact to be resolved by the jury and not of law for the court.

For error in not submitting those issues to the jury, the judgment of the court below is reversed and the case is remanded for a new trial.

*Reversed and remanded.*