### Richmond

## VIRGINIA HEART INSTITUTE, LTD.

## V.

## NORTHSIDE ELECTRIC COMPANY, ET AL.

April 24, 1981.

Present: All the Justices.

Record No. 790001.

*Howard W. Dobbins* (*Robert D. Perrow; Wallerstein, Goode & Dobbins,* on briefs), for appellant.

*Edward A. Marks, Jr.* (*Sands, Anderson, Marks & Miller,* on brief), for appellees.

THOMPSON, J., delivered the opinion of the Court.

Virginia Heart Institute, Ltd. (Institute) filed a motion for judgment against Northside Electric Company (Northside), a Virginia partnership, alleging, *inter alia,* (1) that Northside, while performing electrical work for an expansion of the Institute building, neutralized or disconnected the fire detection system in the building, and recklessly and negligently failed to reactivate or reconnect the system before leaving the premises on December 18, 1975; (2) that on the

evening of December 18, 1975, a short circuit occurred in the structure causing a fire which completely destroyed the building; and (3) that because of the negligence of Northside in failing to reactivate or reconnect the fire alarm system, the fire was not discovered in time to extinguish it and prevent a loss to the Institute.

In its grounds of defense Northside denied that it was guilty of any negligence and further alleged that the Institute was guilty of contributory negligence. In a supplemental grounds of defense, Northside pleaded the statute of limitations, Code § 8-24 (now Code § 8.01-243 with major changes), claiming that the suit was not filed within one year after the loss. The court ordered a jury trial on the issue of liability alone, and the jury returned a verdict for Northside.

The Institute assigns error to the action of the court in submitting the issue of contributory negligence to the jury and in giving Instruction 9 dealing with permissible inferences from withholding material evidence. Northside assigns cross-error alleging that there was not sufficient evidence of primary negligence to submit such issue to the jury.

Sometime during the evening of December 18, 1975, a fire ignited at the Institute building on Berrington Street in the City of Richmond and subsequently completely destroyed the building and its contents. The Richmond Fire Bureau unsuccessfully attempted to extinguish the blaze after responding to a call received from a call box near the Institute building at 1:07 a.m. on the morning of December 19, 1975. Fire engines arrived at the scene at 1:10 a.m.

The Institute had been in the process of expanding its building through construction of a second floor. Century Construction Company (Century) was the general contractor for the job. Northside was employed as the electrical subcontractor to extend the fire and intrusion alarm systems in the Institute building to the new addition, having originally installed those systems in the building several years previously.

The fire and intrusion alarm systems installed at the Institute operated on entirely different, independent circuitry, but both were monitored by a single control panel located within the building. The fire alarm system consisted of strategically placed ionization (smoke) and thermal (heat) detectors wired in series to the control panel. Fire detection by one of these units caused a bell alarm to sound and a telephone dialing mechanism to deliver a prerecorded emergency message to not more than ten programmed numbers. The systems were powered by regular AC current supplemented by emergency battery power (DC). If both power supplies were shut down simul-

taneously, the system was rendered inoperative. In addition, either the alarm or dialing mechanisms could be easily disconnected at the control panel, and disabling one system would not affect the other. The intrusion alarm system was deactivated by use of a key prior to entry into the building and likewise reactivated when the last person left the building. The fire alarm system, however, was designed to be in continuous operation and override the intrusion alarm system should a fire and intrusion occur simultaneously.

On the morning of December 18, 1975, there were several employees of both Century and Northside working on the addition. Edward Pulley, foreman for Northside, and his helper were working on the second floor of the building pulling low voltage wires for the fire and alarm systems in the second floor addition. Dr. Charles Baird, President of the Institute, employees and patients were on the first floor, as well as Dr. Baird's secretary, Carolyn Sheffield, whose office was centrally located in the building. On the wall in Sheffield's office was the alarm bell, and in a smaller room adjoining her office was the control panel and dialer for the fire and intrusion alarm systems.

At trial Dr. Baird testified that the alarm bell had sounded several times on the morning of December 18, 1975, causing the police department to respond to the automatic dialer on at least one occasion and generally disrupting the office. When Dr. Baird complained to Pulley, Pulley stated "he would take care of it" and then went into the room where the control panel was located. Dr. Baird testified that he could not see what, if anything, Pulley did to the control panel, but the alarm bell never sounded again. Dr. Baird's testimony was substantially corroborated by that of Sheffield and the foreman for Century. In fact, Sheffield testified that Pulley told her the alarm might sound that morning because he was working on the systems but that he intended to disconnect it.

A Chief of the Richmond Fire Bureau investigated the fire at the Institute and testified that, in his opinion, the fire originated in a ceiling joist in the film-viewing room located in the center of the first floor in the north end of the building. He estimated that the fire began at approximately 9:00 p.m. on the evening of December 18, 1975, and that the fire could have remained in its "incipient stage" for "a long, long period of time before it was hot enough to begin to emit smoke or any visible means of burning" and it was "bound to have smoldered for quite some time . . . within one or two hours." The Chief also believed that given the location of the fire it was entirely possible that visibility of any flame or smoke from the outside would not have come until much later.

Dr. Baird testified that around 11:15 p.m. on the evening of December 18, 1975, he and his wife, in the company of two friends, drove by the Institute. Although they stopped the car, none of the four got out, and Dr. Baird merely pointed out the new addition. Neither Dr. Baird nor any of the others saw anything amiss.

Sometime after the fire, an adjuster for the Institute's insurance company removed the dialing mechanism from the building and had it examined by an expert who determined that the dialer was in working order. The other parts of the system, including the control panel and detectors, were not retained by anyone. The expert who examined the dialer testified at trial that the dialer "did operate fine on the power source." He also stated that the mechanism lacked the capacity to record whether any of its calls had actually been received, that "it will just say the message whether there is a ring there or not"; that it was designed to dial the number and deliver the message, alternating from one number to the other, for a five-minute period, after which it stopped; and that it was possible that the message was not delivered even if the machine had functioned properly.

It was the Institute's theory at trial, based on the stated evidence, that Pulley deactivated the system and negligently failed to reactivate it before leaving the premises, so that when the fire occurred it went undetected for a prolonged period of time, thereby causing the complete destruction of the building. Northside contended that there were many equally probable causes found throughout the evidence for the failure of the system to sense and report the fire, such as a loss of both AC power and battery power to the control panel, failure of the dialer mechanism to successfully reach a programmed number within the period it operated, failure of employees of the Institute to reset the test switch on the dialer, the lack of a sensing unit in the room where the fire allegedly originated, and the ignition point of the fire being above the ceiling and therefore above all sensing units located throughout the structure.

## I. ADVERSE INFERENCE INSTRUCTION

█ Over the objection of the Institute, the trial court gave Instruction 9,[1] offered by Northside because the Institute did not introduce into evidence the control panel and alarm bell from the Institute's

---

[1] "The Court tells you that where one party to a legal controversy has within his control evidence material to the matters in issue and does not produce it, there arises a presumption that its effect, if produced, would be against the party withholding it."

fire alarm system. Testimony at trial developed that the witness Rigsbee, a fire insurance adjuster, had, in February of 1976, two months after the fire, removed the dialer from the ruins of the burnt building. The dialer was tested and found to be in good working order. However, the control panel and alarm bell were not removed and were subsequently destroyed when the remains of the burnt building were razed. Northside argues that from the failure of the Institute to produce the alarm bell and control panel, an inference can be drawn that, if produced, they would have been unfavorable to the position of the Institute. We do not agree.

In *American Health Insurance Corp.* v. *Newcomb,* 197 Va. 836, 842, 91 S.E.2d 447, 451 (1956), we said: " 'If a party to an action has available competent proof to establish a *fact necessary and material to his success* and fails to produce it, the legal presumption is that if produced the proof would not sustain his claim for relief.' " (Emphasis added.) *See also* C. Friend, *The Law of Evidence in Virginia* § 105 at 219 (1977).

The Institute's cause of action was premised upon the negligence of Northside in deactivating the alarm system and failing to restore the system to a working condition before leaving the premises on the day in question. With the circumstantial evidence adduced the Institute made a *prima facie* case of negligence, and it did not contend that the alarm bell or the control panel was or became defective. Since the alarm bell and the control panel were not necessary and material parts of the Institute's case, then the Institute should not be penalized by a possible adverse inference because these items were not produced at the trial.

## II. WAS CONTRIBUTORY NEGLIGENCE AN ISSUE?

■ Over the objection of the Institute, the court gave Instruction 11.[2] This instruction first told the jury that the Institute was charged

---

[2] Instruction 11 states:

"The Plaintiff, as owner of the property, had a duty to use reasonable care to protect its property from dangers of which it knew or of which it should reasonably have known; specifically, the plaintiff had a duty to use reasonable care to reactivate its fire detection and alarm system if it knew or reasonably should have known that said system was deactivated or inoperative, and to notify the fire department if it knew or reasonably should have known that a fire had commenced.

"Therefore, if you believe from the greater weight of the evidence that the plaintiff knew or reasonably should have known that its fire detection and alarm system was deactivated or inoperative and failed to use reasonable care to reactivate the system, or that plaintiff knew or reasonably should

with a duty to use reasonable care to reactivate its fire detection and alarm system if it knew or should have known that the system was deactivated. We believe the trial court erred in imposing that duty upon the Institute.

The Institute had a right to assume that electrician Pulley, who originally installed the alarm system and was thoroughly familiar with it, and who on December 18, 1975, rendered the system inoperative in order to complete work then under his supervision, would reactivate the system when finished with his assigned tasks. There was no duty on the Institute, its agents or employees, to check or inspect behind Pulley or to assume that he would be negligent in the discharge of his duties. *See Richmond & Petersburg Electric Railway Company* v. *Rubin,* 102 Va. 809, 816-17, 47 S.E. 834, 836 (1904). *See also* J. Dooley, 1 *Modern Tort Law Liability & Litigation* § 4.18 (1977).

The jury was then instructed that if the Institute knew or should have known that its premises were on fire it was charged with the duty to promptly notify the fire department. This instruction was apparently based upon evidence which showed that Dr. Baird and his social guests drove by the Institute building on the night of December 18, 1975.[3]

---

have known that a fire had commenced at its premises and that plaintiff failed to use reasonable care to report the fire, then the plaintiff was negligent.

"And if you further believe that the plaintiff's negligence, if any, was a proximate cause of its losses sustained in the fire, then you shall find your verdict for the defendants."

[3] Dr. Baird's testimony regarding this incident is as follows:

Q. Did you ever return to go inside the premises again that day?

A. No.

Q. Did you ever return?

A. I came back at approximately 11:15 and drove by.

Q. What occasioned your return?

A. I had a Dr. and Mrs. Deep, and I wanted to show them the construction, and we came by and didn't go in and just showed them the second floor.

Q. Did you notice anything out of the ordinary?

A. Well, there was a light shining on the second floor, and that had been done intermittently by the Century Construction people to leave the light or the lamp on.

Q. What later occurred?

A. Well, I went to bed at approximately 11:30, and then I was awakened later that night, I believe by one of the Fire Bureau officials, to tell me that my place had burned down and that they thought that they should advise me.

[On cross-examination, Dr. Baird testified as follows:]

Q. Now, you were riding with your friends the night that you went by there?

We reject the argument that the Institute could be guilty of contributory negligence because Dr. Baird failed to detect the fire when he drove by the premises at 11:15 p.m. In *Agricultural Association* v. *LeCato,* 151 Va. 614, 618-19, 144 S.E. 713, 714 (1928), we said: "It was not negligence on the part of the plaintiff to fail to be on the lookout for a possible omission of the defendant to comply with its duty." Dr. Baird was under no duty to inspect the premises at that time and the record discloses no evidence that the fire was ever visible.

We conclude there is not sufficient evidence to support an instruction on contributory negligence, and we hold the lower court placed a burden on the Institute that it was not required to bear.

### III. SUFFICIENCY OF THE EVIDENCE

██ By assignment of cross-error, Northside challenges the action of the trial court in overruling its motion to strike the Institute's evidence and thereafter in submitting the issue of liability to the jury.

Admittedly, the case for the Instiute as to primary negligence rests upon circumstantial evidence. In *Bly* v. *Southern Railway,* 183 Va. 162, 175, 31 S.E.2d 564, 570 (1944), we said:

> "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which

A. Yes, sir.

Q. And you drove by at about 11:15 p.m., and did they stop the car then?

A. We may have paused momentarily.

Q. Did you-all get out?

A. No.

Q. How far back from the street was the building?

A. I would say 30, 40 feet.

Q. So that you were a greater distance than that from the building when you drove by it at 11:15?

A. Well, the road comes right up to the front of the building, it's very close.

Q. But how far was it away from the building?

A. 30 feet.

Q. And you were in the car?

A. Right.

Q. Do you remember where in the car you were sitting?

A. Sitting in the back on the right, I think.

is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. *The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable.* [Citations omitted.] That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." [Emphasis added.]

The holding in *Bly* was reaffirmed in *Sykes* v. *Langley Cabs, Inc.,* 211 Va. 202, 209, 176 S.E.2d 417, 421-22 (1970), where we said:

"In the case at bar the facts have been established by circumstantial evidence which is not uncertain or indefinite, and they do not rest upon presumption. It is not necessary to base an inference upon an inference in order to deduce negligence from the circumstances. A legitimate inference of want of due care on the part of the defendant can reasonably be drawn by a jury from the established circumstances. *It is not necessary that the circumstances establish negligence as the proximate cause with such certainty as to exclude every other possible conclusion.* It is not necessary to negative every possibility that the *accident occurred in some extraordinary manner which would relieve the defendant.* Often this would be impossible. All that is required is that a jury be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible." [Citations omitted.] [Emphasis added.]

*See also* 57 Va.L.Rev. 1595 (1971) (commenting on *Sykes* v. *Langley Cabs, Inc., supra*).

In this case it was peculiarly within the province of the jury to draw any reasonable inference from the evidence before it. We think the trial court properly submitted the issue of liability to the jury.

For the error of the trial court in giving Instructions 9 and 11 regarding adverse inferences and contributory negligence, respectively, we will reverse the judgment of the trial court and remand the case for a new trial.

*Reversed and remanded.*