WHITE CONSOLIDATED INDUSTRY, INC.,
D/B/A, ETC., ET AL.

V.

ROGER SWINEY, ET AL.

Record No. 860337

January 13, 1989

Present: Carrico, C.J., Poff,* Compton, Stephenson, Russell, Thomas, and Whiting, JJ.

* Justice Poff prepared and the Court adopted the opinion in this case prior to the effective date of his retirement on December 31, 1988.

*James A. L. Daniel (Martha White Medley; Meade, Tate & Daniel, P.C.*, on brief), for appellants.
*Robert W. Mann (Young, Haskins, Mann & Gregory*, on brief), for appellees.

POFF, J., delivered the opinion of the Court.

The defendants in this products liability case appeal from a judgment awarding the plaintiffs damages for property consumed by a fire allegedly caused by a defect in an electric stove. The defendants contend that the plaintiffs failed to prove the elements of an actionable breach of an implied warranty of merchantability, that the plaintiffs' continued use of a product known to be defective barred their claim, and that the plaintiffs failed to prove the quantum of damages claimed.

Plaintiffs Roger Swiney and his wife, Margaret, filed an amended motion for judgment against defendants White Consoli-

dated Industries, Inc., and National Buying Services, Inc., claiming damages in the sum of $141,630.66. Plaintiffs alleged that a defect in an electric stove purchased from National and manufactured by White had caused the fire which destroyed their home and its contents and damaged other personal belongings. Defendants denied the allegation and asserted the defenses of contributory negligence, assumption of the risk, misuse or abuse of the stove, and failure to give reasonable notice of their complaint. A jury returned a verdict for the plaintiffs in the sum of $90,000, and we awarded the defendants an appeal.

The transcript of the record shows that the Swineys purchased the stove from National in March 1982. National's employees loaded the stove upright in its original, unopened, and undamaged crate into Roger Swiney's pickup truck. Roger tied the crate to the truck, drove it home, and, with the help of a neighbor, unloaded and uncrated it.

Following the manufacturer's instructions on the back of the stove, Roger installed the unit and connected the electrical cord to the stove and to the wall receptacle. Roger had built the house and installed the electrical wiring, including the wall receptacles, largely by himself. The old stove had been connected to the same receptacle, and in the 15 years since the house was completed, the Swineys had experienced no electrical problems. Although Roger was not a certified electrician, he had some formal instruction in the trade and had performed frequent electrical jobs.

Shortly after the stove was installed, the stove clock malfunctioned. The oven and burner "eyes" operated only on the highest temperature settings. Asked if his wife was afraid to use the stove, Roger replied, "Unless she was right there with it." He considered the stove "dangerous if you did not watch it."

The Swineys did not register a complaint until October 1982. Roger testified that he went to National and talked with a clerk. "I told her who I was", he said, "and that we had bought a stove from her a few months ago and that my wife said that it was not working to suit her and I wanted to know if I should bring the stove back over there to them or if they sent the repairman out to me. She said that since it was Saturday the repairman was not at work, but she would take my phone number and have him call me Monday morning." Plaintiffs heard nothing further from National.

At 5:00 a.m. on December 30, 1982, the Swineys left home to visit Margaret's mother who was scheduled for surgery at a Roanoke hospital. The stove had not been used for the preceding three days and was not used that morning. Before they left, the Swineys checked the stove and other appliances to make sure all switches were off. When they arrived in Roanoke about 8:00 a.m., they received a telephone call advising them that their home was in flames. The house and its contents were a total loss.

Gary W. Moss, an expert fire investigator, made a visual and physical examination of the electrical wiring in the wall behind the stove and the "pigtail" connector cord. He found "no abnormalities" or "unusual occurrences on the wiring". In Moss' opinion, "the origin of the fire was inside the electric range at or near the left top portion inside the range on the control panel".

Following Moss' investigation, the stove was shipped to Research Engineers Laboratories in Raleigh, North Carolina, where it was examined by Dr. James S. McKnight, an expert electrical engineer. Using the stove as demonstrative evidence, McKnight testified:

> In my opinion, the probable cause of the fire . . . is that the connection on the left rear or the left control of the stove was not made and constructed properly, that it was not assembled properly, and through that poor connection or the bad connection heat was generated which caused the wires in the stove to break down the insulation on the wires, that is, the wires would get hot due to the heat being generated at that improperly made connection.
>
> It would cause the deterioration of the insulation on the wire and gradually it would begin to get brittle or loose and finally it would break down and then the wire would short, either to the metal case of the range or to another wire in the range which it might be against.
>
> . . . .
>
> You can see evidence on the back of the metal wall of the inside of the range that there were splatters where molten metal had splattered against the wall.
>
> That heated the back of the range which in turn heated the wood of the residence and ignited the kitchen.

On cross-examination, McKnight agreed that the defect "could have been corrected by a repairman", but he said that a repairman would "not necessarily" have discovered the loose connection. Asked if the connection could have been "jostled loose" after the stove had left the seller, McKnight replied, "If the stove were properly assembled, I would not expect the shipment . . . to cause any strain on any of the internal wiring within the stove." Concerning Roger's installation of the stove, McKnight said that if the connector cord had been installed improperly, anyone who touched the stove would have received an electrical shock and if the ground wire had been connected too loosely, the damage suffered by the stove would have been different. "I cannot . . . eliminate every other possibility as a cause of the fire," McKnight added. "But in my judgment the most probable cause is the one at the left, the left switch."

Before detailing the facts and circumstances relating to the damages issue, we will consider the questions underlying the liability issue. Applying familiar principles of appellate review, we consider the evidence in the light most favorable to the plaintiffs.

## I. THE LIABILITY ISSUE

In their first assignment of error, the defendants charge that the trial court erred by its "refusal to strike plaintiffs' evidence upon the ground of their failure to prove an unreasonable dangerous condition existing in the stove when it left the hands of the manufacturer and seller." The defendants rely upon language in *Logan* v. *Montgomery Ward*, 216 Va. 425, 429, 219 S.E.2d 685, 688 (1975), where we said:

> [O]ccasionally there is a malfunction which cannot be attributed to negligence or breach of warranty by the manufacturer or seller, but rather is attributable solely to the negligence of the installer or the purchaser, or to some unknown cause.

In *Logan*, we reviewed a judgment against a purchaser of a gas range that exploded and injured the purchaser and damaged her property. The record in that case shows that the stove "was never subjected to an examination by any expert", *id.* at 428, 219 S.E.2d at 687, and that the purchaser, invoking the doctrine of *res ipsa loquitur*, had relied upon the occurrence of the explosion to

prove the existence of a defect at the time of purchase. We agreed that the evidence was insufficient to prove a breach of warranty and affirmed the judgment.

The defendants' reliance upon *Logan* is misplaced. Here, the stove was subjected to examination by two experts. Both found that the point of origin of the fire was inside the stove. McKnight, using the stove as demonstrative evidence, testified that "the probable cause of the fire . . . is that the connection on the left rear or the left control of the stove was not made and constructed properly, that it was not assembled properly". The fair import of that testimony is that a manufacturer's defect in the construction and assembly of the product was the probable cause of the fire.

We have held that an implied breach of warranty may be shown by evidence "sufficient to establish that the result alleged is a probability rather than a mere possibility." *Southern States Coop.* v. *Doggett*, 223 Va. 650, 657, 292 S.E.2d 331, 335 (1982).

> It is not necessary that the circumstances establish negligence as the proximate cause with such certainty as to exclude every other possible conclusion. It is not necessary to negative every possibility that the accident occurred in some extraordinary manner which would relieve the defendant. Often this would be impossible. All that is required is that a jury be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible.

*Bly* v. *Southern Ry. Co.*, 183 Va. 162, 176, 31 S.E.2d 564, 570 (1944); *accord Sykes* v. *Langley Cabs, Inc.*, 211 Va. 202, 208-09, 176 S.E.2d 417, 421-22 (1970); *Virginia Heart Inst.* v. *Northside Electric*, 221 Va. 1119, 1127, 277 S.E.2d 216, 221 (1981).

■ Without benefit of direct evidence, the defendants suggest the possibility that the cause of the fire was some negligent act or omission on the part of Roger Swiney in transporting or installing the new stove. In our opinion, the testimony of the experts raised a jury question, and we will reject the defendants' first assignment of error.

## II. THE DEFENSES ASSERTED

### A. *Use of Defective Product*

As stated by the defendants, the question presented by their second assignment of error is whether "the Swineys' continued use of the stove despite their admitted knowledge of its defective condition bar[s] the claim of reliance upon the implied warranty."

The defendants say that the Swineys learned the day they first used the stove that the clock, the oven, and the burners malfunctioned and that, notwithstanding that knowledge, they continued to use the stove and ignored the instruction in the "Owners' Guide" to report the defect and have it repaired. Citing *Layne-Atlantic Co.* v. *Koppers Co.*, 214 Va. 467, 473, 201 S.E.2d 609, 614 (1974), the defendants argue that "there can be no recovery . . . for breach of the implied warranty of merchantability when there has been a misuse of the article supplied" and that the trial court erred when it "failed to hold that continued use of a defective product constitutes misuse."

We decline to apply such a rule to the facts in this case. It is true that the plaintiffs realized that the clock did not keep the right time and that the temperature controls did not work properly. But the stove functioned for its intended purpose for nearly nine months, and there is no evidence of record to show that the Swineys' continued use adversely affected its function.

We have said that "there can be no recovery against the manufacturer for breach of . . . implied warranties when there has been an *unforeseen* misuse of the article supplied." *Featherall* v. *Firestone*, 219 Va. 949, 964, 252 S.E.2d 358, 367 (1979) (emphasis supplied). We hold, however, that continued use of a product with a latent manufacturer's defect is not a defense to a consumer's claim for breach of implied warranty when the defect merely restricts the utility of the product in the manner it did here. In such case, use by the consumer is foreseeable and cannot be characterized fairly as misuse.

### B. *Assumption of Risk*

In a related argument, the defendants contend that "the Swineys persisted in their use of the stove, day after day, knowing it was dangerous, and assumed the risk of their injury." Without deciding whether the doctrine of assumption of risk is a defense to an action for breach of implied warranty, we find no merit in this

argument. *See Brockett* v. *Harrell Bros., Inc.*, 206 Va. 457, 462-63, 143 S.E.2d 897, 902 (1965) (action is *ex contractu* and contributory-negligence defense does not apply).

■ "Assumption of the risk is venturousness and has two requirements: the nature and extent of the risk must be fully appreciated and the risk must be voluntarily incurred." *Amusement Slides* v. *Lehmann*, 217 Va. 815, 819, 232 S.E.2d 803, 805 (1977). The Swineys could not have appreciated the nature and extent of a risk resulting from a loose connection inside a stove which was unknown to anyone until the stove was examined by an expert. Margaret Swiney testified that she "did not ever think that the stove was dangerous . . . as long as you had those units cut off". And, while Roger Swiney testified that he considered the stove "dangerous if you did not watch it", he had no reason to believe it was dangerous when it was not in use.

Finding no merit in the defenses the defendants assert, we will affirm the judgment insofar as it resolves the liability issue in favor of the plaintiffs.

## III.  THE DAMAGE ISSUE

Addressing their final assignment of error, the defendants argue that the plaintiffs failed to carry their burden of proving the quantum of the damages they claimed. We accept their statement that "the general rule for determining the amount of damages for injury to personal property is to subtract the fair market value of the property immediately after the loss from the fair market value thereof immediately before the injury, the remainder, plus necessary reasonable expenses incurred, being the damages." *See Averett* v. *Shircliff*, 218 Va. 202, 237 S.E.2d 92 (1977). We also agree that, with respect to the inventory of personal property in the house, all of which was completely destroyed by the fire, the plaintiffs failed to satisfy the rule. On cross-examination, Margaret Swiney, who had helped her husband prepare the inventory and estimate the values, testified as follows:

Q. So this inventory in no way represents the value of those items immediately before the fire and the value immediately after the fire, does it?
A. We gave both.
Q. It represents only the value to you?
A. Yes.

Q. But you did not consider what the value was immediately before the fire and the value after the fire?

A. We didn't have the value before the fire.

The inventory as originally prepared and marked as plaintiffs' exhibit F showed the date of purchase and cost of each household item and the amount of the loss as fixed by the Swineys. Following a ruling by the trial court, the only figures remaining on exhibit F as submitted to the jury were the cost figures. Without benefit of any evidence of the rate of depreciation or other proof of fair market value of the contents of the house immediately preceding the fire, exhibit F is insufficient to discharge the plaintiffs' burden of proving the quantum of damages sustained.

The plaintiffs also offered, and the trial court admitted as exhibit J, a document summarizing all the items identified in their testimony as proof of their total claim of loss. As introduced, the total loss shown on exhibit J was $141,709.66, the amount named in the amended motion for judgment. Before exhibit J was submitted to the jury, however, the value of the contents of the house as estimated in the original version of exhibit F was excised from the list in exhibit J, and the values ascribed to several other items were reduced. As amended, the total loss portrayed by exhibit J, including the uncontested appraisal of the house, was $57,285.00.

Counsel for both parties initialed the changes before the exhibit was submitted to the jury. In answer to a question from the bench during oral argument before this Court, counsel for the defendants avowed that he did not intend his initials to represent a stipulation of the proof of the loss sustained. We accept that avowal as verity. Yet, the trial court ruled that the document be admitted as an exhibit for consideration by the jury, the defendants assigned no error to that ruling, and we will not notice a challenge to that ruling on appeal. Rule 5:11(c).

Because we find the plaintiffs' evidence insufficient to support the quantum of damages awarded by the jury, we will reverse the judgment in part and, finding that "the facts before [us] are such as to enable the court to attain the ends of justice", Code

§ 8.01-681, we will enter final judgment for the plaintiffs in the sum of $57,285.00.

*Affirmed in part, reversed in part, modified, and final judgment.*