# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

MARYLAND AND VIRGINIA MILK
PRODUCERS COOPERATIVE
ASSOCIATION, INC.,

> *Plaintiff-Appellee,*

v.

CROWELL FARMS, INCORPORATED,

> *Defendant-Appellant.*

No. 03-1769

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-02-1847-A)

Argued: February 25, 2004

Decided: June 9, 2004

Before MOTZ, KING, and GREGORY, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Steven Walter Bancroft, TRICHILO, BANCROFT, MCGAVIN, HORVATH & JUDKINS, Fairfax, Virginia, for Appellant. Lloyd Lee Byrd, SANDS, ANDERSON, MARKS & MILLER, Richmond, Virginia, for Appellee. **ON BRIEF:** Heather K. Bardot, TRICHILO, BANCROFT, MCGAVIN, HORVATH & JUDKINS, Fairfax, Virginia, for Appellant. Lisa T. Hudson, SANDS, ANDERSON, MARKS & MILLER, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## **OPINION**

PER CURIAM:

Maryland & Virginia Milk Producers Cooperative Association, Inc., (the "Cooperative"), filed this action against Crowell Farms ("Crowell"), alleging that Crowell breached the terms of the parties' "Marketing Agreement" by delivering adulterated milk to Milkco, Inc. ("Milkco"), one of the Cooperative's milk processing customers. On cross motions for summary judgment, the district court granted summary judgment in the Cooperative's favor. Crowell appeals. For the reasons that follow, we affirm.

### **I.**

The Cooperative, a member of the Advantage Dairy Group[1] ("ADG"), is a Virginia corporation that operates as an agricultural cooperative, which is in the business of handling, marketing, and selling the raw milk of its producer members to commercial entities in the food industry. The Cooperative has approximately 1,600 producer members. Crowell, a North Carolina dairy farm, became one of the Cooperative's producer members when it entered into a Marketing Agreement with the Cooperative on May 23, 2000. The Marketing Agreement required Crowell to "produce milk in compliance with all governmental laws and regulations applicable to [Crowell]." (J.A. 43 (Marketing Agreement C(2).). The Agreement further required Crowell to "deliver the milk to the [Cooperative] in pure and *unadulter-*

---

[1]ADG is a group of "separate cooperatives that have further grouped together." (J.A. 370 (Dep. James Howie - Director of Regulatory and Legislative Affairs for the Cooperative)). "ADG is a cooperative corporation which was established in January 2000." (*Id.* 411 (Decl. Jay Bryant - General Manager of the Cooperative).). It is comprised of five member cooperatives, which function to more efficiently market the milk to its processors. ADG has no facilities or employees; rather, ADG functions solely through its respective cooperative members. *Id.* at 411-12.

*ated* condition suitable for sale or processing." *Id.* (emphasis added). Most importantly, the Agreement provided that

> in the event of a breach by [Crowell] of any material provision of this Agreement, particularly the provision relating to the sale of the milk to the [Cooperative], the [Cooperative] . . . *may recover full damages for the breach.*

*Id.* at C(8) (emphasis added).

Milkco is a milk processing facility in Asheville, North Carolina. Milkco entered into a Supplemental Milk Supply Agreement ("Supplemental Milk Agreement") with the Cooperative, requiring the Cooperative to supply milk to Milkco. (J.A. 45-46.) J. Rice Trucks, Inc., ("Rice Trucks"), is a hauling company with whom Crowell had contracted to deliver Crowell's milk to Milkco.

On September 14, 2002, Rice Trucks delivered a load of raw milk from Crowell to Milkco. The milk was tested for foreign substances, as required by law, and Crowell's load tested positive for antibiotics in three separate tests. After Rice Trucks was notified that the load of milk had tested positive for antibiotics, Tony Rice, the company's owner, called Michael Crowell, who was then President of Crowell Farms, to inform him of the test results and that Crowell's load of milk had been rejected. During that conversation, Michael Crowell told Tony Rice that he could not afford to lose that load of milk because it was too costly for his milk farmers. (J.A. 331-32 (Crowell Dep.).) In response, Tony Rice told Michael Crowell that he would add another producer's load of milk to Crowell's adulterated load the following day, which would dilute the levels of antibiotics in the milk below the detectable level, thereby preventing a loss to Crowell and his farmers. *Id.* at 332-33 (Crowell Dep.).

The following day, September 15, 2002, Tony Rice added a load of another producer's milk to Crowell's antibiotic-contaminated milk and delivered the mixed load back to Milkco. Upon delivery to Milkco, the milk was tested again, and it no longer tested positive for antibiotics. Thereafter, Milkco accepted the load of Crowell's milk and began processing it. However, on September 16, 2002, Milkco officials realized they had received approximately forty thousand

more pounds of milk than expected. Upon investigation, the additional milk supply was traced to Crowell Farms, and Michael Crowell admitted to adding non-contaminated milk to his previously rejected load, which explained Milkco's overage. Milkco immediately shut down its plant, until the contaminated milk could be located. Fortunately, most of the products containing the adulterated milk were located on site, however, a load of cream containing the contaminated milk had already been shipped to Kraft Foods, Inc. ("Kraft"), in New York, before the embargo went into effect. New York authorities ordered the Kraft product containing Crowell's adulterated milk to be destroyed, and the remaining contaminated milk product at Kraft's plant was segregated and destroyed.

As a result of receiving adulterated milk from Crowell, Milkco sustained significant losses related to the detection, removal, and destruction of the adulterated product. The total loss amounted to $441,963.69, not including lost profits. The Cooperative reimbursed Milkco for the full amount of its losses, and thereafter the Cooperative sought to be reimbursed by Crowell. The district court granted summary judgment in the Cooperative's favor, holding that the Cooperative was entitled to reimbursement from Crowell because it "had the legal obligation under the commercial conduct of warranties of merchantability . . . to pay Milkco for its damages." (J.A. 38.) We agree.

## II.

On appeal, we review the granting or denial of summary judgment *de novo*. *Nielson v. Gaertner*, 96 F.3d 110, 112 (4th Cir. 1996). Summary judgment is appropriate for the moving party if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). It is clear from our review of the record that there is no genuine issue of material fact regarding whether Crowell's breach caused the Cooperative to suffer damages in excess of $400,000.

## III.

Crowell, while admitting that it deliberately delivered adulterated milk to Milkco, nonetheless argues that it cannot be held liable to

reimburse the Cooperative for the money it paid to Milkco, because the Cooperative was never contractually obligated to reimburse Milkco. The basis for Crowell's argument is that the Supplemental Milk Agreement was not between the Cooperative and Milkco, but rather between ADG and Milkco.[2] Ultimately, Crowell maintains that any payment the Cooperative made to Milkco was voluntary, and therefore, Crowell has no indemnification liability.[3] Conversely, the Cooperative argues that it was contractually bound to Milkco, and moreover, under the implied warranty of merchantability, the Cooperative was obligated to reimburse Milkco for the losses Milkco suffered as a result of Crowell's breach. We agree with the district court's holding that the Cooperative, and not ADG, was the legal party in interest, and that the Cooperative was legally bound to reimburse Milkco for the losses resulting from Crowell's breach. Accordingly, we hold that the Cooperative was entitled to summary judgment, and we therefore affirm the district court's ruling.

It is undisputed that Crowell and the Cooperative had a contractual agreement, which required Crowell to deliver unadulterated milk to the Cooperative, which, in turn, marketed and sold Crowell's milk to interested dairy processors. (J.A. 43-44 (Marketing Agreement).) Additionally, as previously stated, *supra*, at 2, the Cooperative[4] had

---

[2]The Supplemental Milk Agreement states that "Advantage Dairy Group will supply milk to Milkco. . . ." (J.A. 45 (emphasis added).)

[3]Crowell also argues that Milkco could not have recovered from the Cooperative due to Milkco's own negligence in accepting Crowell's milk on September 15, 2002, despite knowing that Crowell had its permit suspended the day before. However, Virginia is a contributory negligence state, and the Virginia courts have held that contributory negligence is not a proper defense in breach of implied warranty actions because such actions are regarded as *ex contractu*. *See, e.g.*, *Wood v. Bass Pros Shops, Inc.*, 462 S.E.2d 101, 103 (Va. 1995); *White Consol. Indus., Inc. v. Swiney*, 376 S.E.2d 283, 286 (Va. 1989); *Brockett v. Harrell Bros., Inc.*, 143 S.E.2d 897, 902 (Va. 1965).

[4]Crowell maintains that the Cooperative never had an agreement with Milkco, because the signatories to the contract were the Advantage Dairy Group and Milkco; not the Cooperative. We shall not tarry long on this argument. As previously explained, *supra* n.1, ADG, which operates as a conglomerate of cooperatives, has no employees or facilities of its own;

a contractual agreement with Milkco, whereby the Cooperative would supply milk to Milkco. (J.A. 43 (Supplemental Milk Agreement).)

The parties agree that all relevant contracts, including the Marketing Agreement and the Supplemental Milk Agreement, are to be interpreted under Virginia law. The Virginia commercial code contains a provision regarding the implied warranty of merchantability, which states that, unless excluded or otherwise modified:

(1)    a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

(2)    Goods to be merchantable must be at least such as

(a)    pass without objection in the trade under the contract description; and ***

(c)    are fit for the ordinary purposes for which such goods are used.

Va. Code Ann. § 8.2-314. To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." *Id.* § 8.2-314(2)(c). The Code defines a "merchant" as someone

---

rather it operates solely through its member cooperatives, of which the Cooperative is one. The Supplemental Milk Agreement, which was in effect at the time of the incident in question, was prepared on the Cooperative's letterhead and was signed by Jay Bryant, General Manager of the Cooperative. (J.A. 45, 411.) Moreover, when the Cooperative provided milk to Milkco, the Cooperative, not ADG, would invoice Milkco. *Id.* at 412. Likewise, when Milkco suffered its significant loss as a result of processing Crowell's adulterated milk, Milkco sent a statement of damages requesting reimbursement from the Cooperative; not to ADG, which the Cooperative, not ADG, paid. *Id.* at 413. Crowell does not dispute that the Cooperative, not ADG, reimbursed Milkco for its losses. Accordingly, there was no real dispute as to whether the Supplemental Milk Agreement was a contract between Milkco and the Cooperative; not between Milkco and ADG. Thus, Crowell's argument that the Cooperative and Milkco were never contractually bound to one another is meritless.

who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

*Id.* at 8.2-104.

It is undisputed that both the Cooperative and Crowell were, at the time of Crowell's breach, merchants with respect to milk. In fact, both parties stipulated that Crowell "at all times relevant to this matter, was a dairy farm producer," and that the Cooperative "at all times relevant and material hereto . . . was a milk cooperative. . . ." (J.A. 30.) Accordingly, both the Cooperative and Crowell were bound by the implied warranty of merchantability, obligating them to provide milk suitable for its intended use, *i.e.*, unadulterated and fit for human consumption.

More specifically, Virginia courts have long held that the sale of food for immediate consumption carries with it an implied warranty of "wholesomeness." *Kroger Grocery & Baking Co. v. Dunn*, 25 S.E.2d 254, 256 (Va. 1943) (citing *Colonna v. Rosedale Dairy Co.*, 186 S.E. 94, 95-96 (Va. 1936) (holding that "in contracts for provisions it is always implied that they are *wholesome*, and if they are not, case lies to recover damages for the deceit) (internal citation omitted) (emphasis added), *superceded by statute on other grounds as stated in*, *Friedman v. Peoples Service Drug Stores, Inc.*, 160 S.E.2d 563 (Va. 1968)). That principle was reinforced in *Swift & Co. v. Wells*, 110 S.E.2d 203 (Va. 1959), when the court held as follows:

Since an early date, the courts have made a distinction with respect to warranties between the sale of food and other articles of commerce. As far back as 1266 A.D., a statute of England provided: 'It is ordained that no one shall sell corrupt victuals.' 51 Hen. III, stat. 6. Early English decisions repeatedly held that an action on the case lies against the seller of corrupt food whether the same was warranted to be good or not. Keilway's 92, 72 Eng. Reprint 254; *Roswel v.*

> *Vaughn*, (1607) Cro. Jac. 196, 79 English Reprint 171. The foregoing principle was adopted by early decisions in America. In *Van Bracklin v. Fonda*, (1815) 12 Johns. N.Y. 468, 7 Am. Dec. 339, the court held that in contracts for sale of provisions for human use it is always implied that they are *wholesome* and that if they are not the seller is liable in damages to the consumer.

*Id.* at 206. Ultimately, the court in *Swift* held that Virginia follows "the common law doctrine that one who sells foodstuff for human consumption impliedly warrants its fitness and wholesomeness for such purpose, and . . . is also liable on the implied warranty where there is privity of contract between the vendor and vendee." *Id.*

Privity clearly exists between the Cooperative, as vendor, and Milkco, as vendee. The Cooperative had a contractual agreement to provide milk suitable for human consumption to Milkco, despite Crowell's argument that Milkco did not contract with the Cooperative, but that it contracted with ADG instead. As we previously explained, *supra* n.4, the contract with Milkco was executed on the Cooperative's letterhead and was signed by the Cooperative's General Manager, thus ADG was not a party to the contract. The Cooperative breached the implied warranty of fitness and wholesomeness and its contract with Milkco by providing it with Crowell's adulterated milk, causing Milkco to suffer direct damages in excess of $400,000, which the Cooperative paid. Because privity existed between the Cooperative and Milkco, the Cooperative was legally obligated to pay Milkco for the damages it suffered as a result of the Cooperative's delivery of Crowell's adulterated milk to Milkco. Because it is undisputed that Crowell was in privity of contract with the Cooperative, Crowell is legally obligated to reimburse the Cooperative for the amount of damages it paid to Milkco.

## IV.

For the aforementioned reasons, we hold that the district court's decision to grant summary judgment in the Cooperative's favor was proper, and we hereby AFFIRM.

*AFFIRMED*